Adrian MANDUJANO et al., Plaintiffs,

Daniel Perez and Fidel Gutierrez,
Plaintiffs-Appellants,

v.

BASIC VEGETABLE PRODUCTS, INC.,
et al., Defendants-Appellees.

No. 74–2068.

United States Court of Appeals,
Ninth Circuit.

Aug. 27, 1976.

Anthony Gaenslen (argued), of Gaenslen & Fassler, San Francisco, Cal., Theodore G. Smith (argued), of Smith & Johnson, San Jose, Cal., for plaintiffs-appellants.

Alan B. Exelrod (argued), of Exelrod & Mendelson, San Francisco, Cal., Jonathan H. Sakol (argued), of McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., for defendants-appellees.

* Honorable William G. East, Senior United States District Judge, for the District of Oregon, sitting by designation.

1. The complaints charged that Basic and the Unions had maintained a continuing policy, practice and custom of discrimination against the class with respect to compensation, terms, conditions and privileges of employment based on race, color, religion, sex or national origin. The relief sought was (1) injunctive relief

OPINION

Before TRASK and SNEED, Circuit Judges, and EAST,* District Judge.

SNEED, Circuit Judge:

This case comes before us as an appeal from a district court approval of a settlement of a class action suit filed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. The case involves alleged racial, ethnic, and sex discrimination by the employer, Basic Vegetable Products, Inc. ("Basic") and the two Unions representing the workers at the two Basic plants. Appellants challenge the propriety of the class settlement on several grounds. We hold that procedures followed in approving the settlement were inadequate and we remand to the district court for proceedings consistent with this opinion.

I. *The Facts.*

This case originated with nine individual charges being filed with the EEOC which alleged that Basic and the Unions representing Basic's employees were guilty of employment discrimination. Subsequently a class action was filed against the Unions and Basic with the same nine individuals as named plaintiffs.[1] The original complaint proposed a class defined as all Chicano workers employed by Basic at its plant in King City, California. An amended complaint, filed some 18 months later and pursuant to Rule 23(b)(2), Fed.R.Civ.P., included Basic's employees at its Vacaville, California plant and enlarged the members of the class to include:

[A]ll past, present, future and potential employees and applicants of Basic who

against the alleged discrimination, (2) declaratory judgment that the policies, practices and customs of the defendants were violative of Title VII, (3) reinstatement and back pay for those employees of Basic who had been unlawfully terminated, (4) an affirmative action program including managerial training, (5) $100,000 punitive damages, (6) attorney fees and costs.

are Negroes, Asians, American Indians, Spanish-surname Americans or females. This definition included some 2700 Basic employees.

After the original complaint had been filed in district court, the EEOC investigated the charges which had been filed with it. At the conclusion of the investigation the amended complaint was filed and a settlement was negotiated.[2] This settlement is the basis for the present appeal.

## II. *The Issue.*

Appellants raise a number of questions about the propriety of the class settlement.[3] Several of these contentions are, on the present record, potentially meritorious. We will deal with this problem by first giving our view of the nature of this type of class action and the procedures which must be applied to protect dissidents. Thereafter, we will consider whether the procedure employed in this case meets the prescribed standard. We will conclude with a discussion of the sources of the concern we have with respect to the terms of the settlement agreement.

## III. *Procedures To Protect Dissidents In Title VII Class Actions.*

 Our disposition of this case is governed by a few fundamental propositions about the nature of a class action. We start with the notion that a *proposed class* conforming to the requirements of Rule 23(b)(2) is not a legal entity to which any individual plaintiff's legal rights are to be sacrificed. As a consequence, the attorney for the class is not to be viewed as a negotiator in a process of collective bargaining where majority rule prevails. *See Airline Stewards & Stewardesses Ass'n, Local 550*

**2.** Representatives of the EEOC, Basic, the Unions, California Rural Legal Assistance (for plaintiffs), the Mexican-American Legal Defense Fund (for plaintiffs), and the private attorneys for the plaintiff class negotiated the settlement which is the basis of the present appeal. The settlement was described in the notice to the class members as follows:

Basic Vegetable Products, Inc. ("Basic") will undertake affirmative action and endeavor, through established goals based on relevant work statistics, to achieve reasonable minority group and female participation through all levels of its work force. Basic will, through preferential bidding and incentive payments, seek qualified females for promotion to jobs in brackets 5–9 in Vacaville and E–H in King City. Basic will conduct on the job training program for minority group and female employees seeking promotion to positions as mechanics. Basic will provide year-round employment to minority group and female employees in brackets . . . so long as employees in their pay bracket are employed and work is available that they are qualified to do. In arbitrations involving Spanish-surnamed American employees who cannot speak or read English, a translator for the grievant and an explanation of the arbitrator's decision will be provided if the grievant so requests. Basic will re-evaluate and continue to evaluate the qualifications of minority group and female employees to fill the vacancies in salaried supervisory positions. Basic will establish a trust fund of $75,000 to make incentive payments to females attaining jobs in brackets . . . until the percentage of females in those brackets is 20%

and to pay the claims of individually-named plaintiffs and those other members of the class who, prior to 10/29/73 filed claims against the Company with the Equal Employment Opportunity Commission to the extent that those claims are settled or awarded by Louis Garcia acting as an impartial arbitrator, the remainder of the fund, if any, to be irrevocably committed to affirmative action purposes.

One aspect not mentioned in the summary is the provision for an expedited conciliation procedure available to employees filing an EEOC complaint subsequent to 10/29/73, the date the amended complaint was filed.

**3.** The appellants raise the following questions with regard to the propriety of the approval of the class action settlement below: (1) the district court's denial of a continuance of the hearing on January 28, 1974, at which the settlement was approved, was an abuse of discretion; (2) the notice of the settlement was inadequate in its timing; (3) the class was not adequately represented by the named plaintiffs or their attorneys; (4) the terms of the settlement are inadequate; (5) the Unions incurred no affirmative obligation to redress their past discrimination; (6) the expedited arbitration procedure included in the settlement is illegal as it conflicts with the decision in *Alexander v. Gardner-Denver*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), regarding the relationship between Title VII procedures and binding arbitration of the same dispute; (7) conflicts among class members.

*v. American Airlines, Inc.,* 490 F.2d 636 (7th Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 773 (1974). The class is not the client. The class attorney continues to have responsibilities to each individual member of the class even when negotiating a settlement.[4]

■ It is true, of course, that settlements by their very nature will require compromise. In addition, it must be recognized that the class attorney may be tempted to sacrifice the interests of certain members of a Rule 23(b)(2) class in an effort to achieve the "greatest good for the greatest number." We are not prepared to say that the potential, or even actual, existence of this temptation is sufficient to require denial of Rule 23(b)(2) certification in Title VII cases. It is imperative, however, to assure that before settlements receive judicial approval the court be well-informed of the views of those who feel that they are being called upon to make the sacrifices. Only by being so informed can the court be certain that the settlement does not compromise the legal rights of class members without their consent. Such a compromise is a violation of due process. *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Being so informed is also necessary to permit the court to determine whether the expressed dissatisfactions with the proposed settlement agreement deprive it of the fundamental fairness which it must possess to merit approval.

■■ To provide the protection to which dissident Rule 23(b)(2) class members are entitled and to assist the courts in reviewing proposed settlements we believe certain procedural safeguards are necessary. The first of these pertains to notice. Rule 23(e), Fed.R.Civ.P., requires that notice of a "proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." To comply with the spirit of this rule, it is necessary that the notice be given in a form and manner that does not systematically leave an identifiable group without notice.[5]

A proper notice must indicate that a member of the class can object to the proposed settlement as well as to the manner in which the class is defined. Each objection so made must become a part of the record of the case. The trial court before approving a proposed settlement must review carefully these objections. Those determined to be substantial cannot be rejected without an opportunity being afforded the objector to be heard. To assure an adequate hearing the trial court should not hesitate to permit an attorney of the objector's choosing to appear at the hearing and to represent the objector.[6] The creation of

---

4. These responsibilities are reflected in Canons 5 and 7 of the Code of Professional Responsibility, American Bar Association, as amended February, 1975. Canon 5 requires the lawyer to "exercise independent professional judgment on behalf of a client" and Canon 7 requires a lawyer to "represent a client zealously within the bounds of law." Ethical Considerations (EC) 5–14, 5–15, 5–16, and 5–17 caution the lawyer to refrain from representation of multiple clients having "potentially differing interests." EC 7–7 explicitly states that "it is for the client to decide whether he will accept a settlement offer or whether he will waive his right to plead an affirmative defense."

5. We cannot say with assurance that this was done in this case. The notice of settlement was dispatched at a time when perhaps as many as 75% of the employees were not within the area in which they are employed. Notwithstanding this fact, less than 10% of the notices were directed to addresses outside the employment area. While these facts alone do not justify holding that there was a failure to comply with Rule 23(e), they do strengthen our resolve to remand this case to the district court. *See* Part IV *infra.*

6. Unfortunately the same economic incentive which create settlements which infringe individual rights will often make it economically infeasible for private counsel to represent small groups of objecting class members. We regret to say that there appears to be no authority for a district judge to appoint counsel for objecting class members even when the interests of justice would so demand. Such action would be consistent with the trial courts responsibilities under both Rule 23(a)(4) and 23(e). In addition, Title VII allows for an award of attorney's fees. 42 U.S.C. § 2000e–5(k). But such awards can only be made to "the prevailing party." Hence appointed counsel might in such a situation be forced to go uncompensated. *But see Amalgamated Meat Cutters*

subclasses to aid in the evaluation of the settlement is not improper.

■■ The hearing which an objection of substance makes necessary must be sufficient to enable the trial court to set forth on the record a reasoned response thereto. Such findings of fact and conclusions of law as may be necessary to support the response must also appear on the record.[7] Objections found to be without substance and frivolous require no hearing, but the trial court should set forth on the record its reasons for so considering the objection. Objections of substance which after a proper hearing are found by the trial court to require modification of the proposed settlement prior to judicial approval undoubtedly will bring about additional negotiations in which the class attorney and the dissenters and their attorneys, if any, will participate. Out of these negotiations may come a new settlement offer more responsive to the interests of all class members. If not, the class action will proceed in a normal fashion.

Observance of these procedures will impose a burden on trial courts required by Rule 23(e) to approve dismissals or compromises of class actions intended to vindicate Title VII rights. This added burden, however, is necessary to assure that valid objections are voiced, to inform the trial court, and to create a reviewable record. *See Price v. Lucky Stores, Inc.,* 501 F.2d 1177 (9th Cir.1974). The interests Title VII is designed to secure are sufficiently important to warrant procedures which minimize the risk of those interests being prejudiced by the normal pressures to settle complex litigation affecting a substantial part of the work force of an employer. The employer, the attorneys of the class, the class mem-

bers with the most to gain from the proposed settlement, and, as in this case, sometimes the EEOC will support the compromise. Against this array may stand, again as in this case, a few dissenters. They deserve the consideration we suggest. If they are not spoilers, the record should reflect that fact. Only then can it be said with assurance that the settlement is just.

IV. *Application of Procedures To This Case.*

The fact that the procedures outlined above could not have been followed literally by the trial court, acting prior to their formulation, does not require reversal of that court's approval of the settlement if the procedure in fact employed provided the essence of the protection we believe appropriate. The matter is not free from doubt; but after careful scrutiny of the record we believe such protection was not afforded.

■ This conclusion rests on the fact that the record reveals no reasoned response to numerous objections to the settlement. There exists, for example, no such response to allegations that the class attorney failed to turn over to the court certain objections to the settlement, to allegations regarding the inadequacy of the notice given the terms of the proposed settlement,[8] and to allegations of widespread ignorance of the terms of the settlement among a large number of the class members. Also objections to the class attorney and assertions by dissidents that they were given inadequate time to obtain another attorney were not responded to by the trial court in a manner that permits a proper appellate review. Finally, certain objections to the settlement terms, such as that minorities as well as women should be entitled to incentive pay and that the percentage of minorities

---

*(MCBW) Local 340 v. Safeway Stores, Inc.,* 4 E.P.D. ¶ 7670 (D.Kan.1972).

In those cases, however, where it appears that objectors lack separate counsel due to their lack of sophistication rather than financial inability to attract counsel, it would be proper for a trial court to suggest that the court would be greatly aided if the objectors' position were presented by independent competent counsel.

7. Hearings incident to management of class actions are a commonplace. Only by such hearings can the numerous tensions created by class actions, particularly those by Rule 23(b)(2) classes pursuing Title VII relief, be resolved. *Cf. Huff v. N. D. Cass Co.,* 485 F.2d 710 (5th Cir.1973) (en banc).

8. *See* note 5 *supra.*

projected for training programs is too small, apparently were not considered by the trial court. In any event, no record of explicit consideration exists.

These deficiencies of the record make it impossible to say that adequate protection was afforded the dissidents and that they are mere spoilers whose objections are without merit.

### V. *Sources of Concern Regarding Terms of Settlement.*

Our holding is reinforced by a genuine concern we have regarding the manner in which the settlement responded to certain potential conflicts between members of the class. The first of these is that between seasonal migratory workers, who comprise approximately 75% of Basic's work force, and the full time employees of Basic. In oral argument it was asserted that the seasonal migratory workers desired an increased opportunity to become full time employees. Any such gain would be at the expense of full time employees, a substantial number of which are class members. Perhaps the asserted conflict is non-existent or of little consequence; but the present record does not permit us to know.

■ Of even greater significance is the fact that of the nine representative plaintiffs, five oppose the settlement. The opposition of a significant number of the members of the class to a proposed settlement is a factor to be considered when approving a settlement. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3rd Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *Amalgamated Meat Cutters (MCBW) Local 340 v. Safeway Stores, Inc.*, 4 E.P.D. ¶ 7670 (D.Kan.1972). The presence of such opposition requires a record in which the "seasoned responses" of the trial court to their objections appear.

■ We also are concerned with the effect of the proposed settlement on employees not members of the class. These employees, presumably all Anglo males, constitute a minority of the total work force. Perhaps no improper consequences will flow

from the proposed settlement, but on the basis of the present record, we simply do not know. To remove this uncertainty the district court on remand should consider explicitly the effect, if any, of the settlement on employees not members of the class. *Cf. United States v. Navajo Freight Lines, Inc.*, 525 F.2d 1318 (9th Cir.1975).

REVERSED AND REMANDED.

TRASK, Circuit Judge (dissenting):

The history of this dispute and the elaborate and lengthy proceedings taken to assure its equitable settlement seem to me to require its resolution at this time without further litigation. I would therefore decide it without remand.

A brief chronology of the case is helpful. It discloses that in March of 1971, the Mexican-American Legal Defense and Educational Fund (MALDEF) was notified by some employees of Basic Vegetable Products, Inc. (Basic) that there were employment discrimination problems at the cannery plant. An investigation was thereupon launched and continued over a period of months, resulting in a class action complaint asserting illegal·employment discrimination and civil rights violations being filed in this case in March 1972. Prior thereto, on January 27, 1972, the Equal Employment Opportunity Commission (EEOC) had filed a Commissioner's charge encompassing the same general allegations. A stay of the complaint was entered by stipulation between litigants and the agency to permit EEOC to make an investigation with its personnel and facilities.

At the conclusion of a lengthy investigation, EEOC, Basic, the unions involved, along with representatives of MALDEF and the California Rural Legal Assistance and attorneys for the plaintiff class, began more than six months of negotiations. These negotiations ultimately resulted in a settlement agreement in September 1973, which was presented to the district court for approval on November 28, 1973.

This document, representing an in-depth analysis of payroll, personnel, including racial and ethnic mix, job classification and

promotion, was a complete study of Basic's employment practices as they had to do with any conceivable discrimination. After this document was produced as a distillate of the give-and-take of employer, minority groups, government agency policy representatives and labor leaders, it was taken by the attorneys for MALDEF and the California Rural Legal Assistance to their clients in a two-day meeting, at which they explained its meaning and effect both in English and in Spanish. Thereafter, they sent to all named plaintiffs a written copy of the Conciliation & Settlement Agreement, as it was called.

Elaborate care was taken to see that all members of the class received notice of the agreement and of the hearing to consider its approval or disapproval. By order of court on November 28, 1973, Basic was required to send individual notices to all members of the class who were presently employed, had been employed within the past year, or who had charges pending before the Commission against either Basic or the Union. A total of 2698 personal mailings were sent out. Copies were posted on the main bulletin board and in the operating departments of each of its plants.[1] Finally, Basic published the notice in both English and Spanish in newspapers of general circulation in Solano and Monterey counties. The hearing was set for January 28, 1974, 30 days after all notice requirements were to have been complied with. A notice of a hearing for court approval of the agreement was given by mailing and publication on December 28, 1973, and a hearing was held in court one month later, at which time the settlement was approved. Notice of appeal was filed by two class members on February 27, 1974.

The majority opinion first considers the nature of this type of class action and the general procedures thought to be advisable in settlement of Title VII Class Actions. It then directs its attention to the application of those general notions to the particulars of this case. It finds that the record does not disclose clearly that proper protection was given to dissidents in this case, resting its decision not upon any particular deficiency of the settlement agreement but largely upon the fact "that the record reveals no reasoned response to numerous objections to the settlement."

Of those objections the first mentioned is the matter of "potential conflicts between members of the class." The example cited is the conflict between seasonal migratory workers and full time employees of Basic. The majority opinion, after stating the problem, somewhat inconclusively observes, "Perhaps the asserted conflict is non-existent or of little consequence; but the present record does not permit us to know."

I would add that the objection, if it exists, was never properly brought before the court prior to or during the hearing. The notice of hearing, which was mailed, posted and published, provided that any member of the class could appear at the hearing and show to the court why the settlement should not be approved. It further provided that no person should be heard at the hearing unless notice of intention to appear and all grounds for the objections, with supporting papers, had been filed with the court on or before January 18, 1974, and proof of service on four of the named counsel in the proceedings was demonstrated. The petitions here were mailed with no proof of service and contained conclusory statements [2] with no supporting grounds of

---

1. For instance, the affidavit of posting at the King City plant shows that posting was made on December 28, 1973, on bulletin boards at the following locations: Main Cafeteria; Laboratory; Storeroom; Maintenance Shop; OFP Cafeteria; Shipping, Case and Label area; Garlic Mill area; Onion Mill area; F & S Office; P & S Cafeteria; Garlic Seed; Garlic Field Maintenance Shop; and Personnel Office (Main Bulletin Board).

2. "1. The Fund is inadequate to compensate the people.

"2. Minorities, as well as women, should be entitled to incentive pay.

"3. The percentage of minorities projected for the training programs is much too low.

"4. Testing procedures are discriminatory.

"5. Future employees are denied any options.

any kind.

Yet the court at the hearing permitted Ms. Loya to speak as well as Mr. Gutierrez. Mr. Ruben Rayas, described as a spokesman for the so-called dissident group, was also permitted to speak although he had not submitted his name and was not a representative plaintiff or a member of the class. His remarks bore no relevance to the conclusory objections on the petition. He complained about the inadequacy of Mr. Mendelson, attorney for MALDEF, and asked for more time because the people did not understand the settlement agreement.[3]

In short, the objections asserted as to the "potential conflicts between members of the class" appear to be afterthoughts urged now by newly-employed counsel, which were never urged upon the trial court and apparently never brought before those charged with developing an agreement to reconcile the differences among the parties.

Similarly most if not all of the other objections suggested by the majority opinion were never brought to the attention of the trial court before, at, or after the hearing held to consider the approval of the agreement. There was therefore no occasion for the trial court to consider them or to give to them any "reasoned response."

The format of the hearing was an orderly one designed to develop any problems in the proposed settlement being submitted to the court for approval. The district court judge indicated that he had read the petitions of certain objectors but was uncertain as to their meaning. He then called upon each of the attorneys of record to state his position with respect to the settlement. Except for one slight modification which had been agreed upon, all attorneys spoke favorably of the proposed settlement, including attorney Zugschwerdt from the Regional Council's Office in Washington.

The court heard from several individuals and then stated:

"I will make a finding, a tentative finding that this is an appropriate class as has been defined in the settlement agreement; all the terms of the order previously submitted having been complied with; that all protests have been duly noted; and that the proposed settlement is fair and equitable, with the understanding that the individuals who have personally filed with the E.E.O.C. prior to the filing of the amended complaint are entitled to individual settlement of their claims." R.T. at 16.

The court continued reading the general terms of the agreement from the summary contained in the notice and continued by quoting from other terms not contained in the summary but in the agreement. The court concluded:

"Gentlemen, I think this is a good settlement of the existing problem and it is a good plan for future conduct of this business and it will prevent any further problems of this nature arising.

"So if you will present to me the modified form of judgment, I will be prepared to entertain it." R.T. at 19–20.

---

"6. The mechanism for conciliation under the agreement is weak and costly in time and money."
C.T. at 169.

**3.** The court attempted to explain the effect of the agreement, saying:

"Mr. Rayas, I am sure that you understand that this agreement only settles the grievances up to the date it is signed. It sets up a program to try to avoid future problems that arise in the future. But if in the future any discrimination exists against any of these members of this class, they have a right to come in and initiate further action.

"What this does is settle the problems up to this point, provides individual settlement for those who filed complaints, and sets up a program that will hopefully prevent probelms [sic] from arising in the future.

"So if it turns out that the problems are not resolved, you are not barred from again coming in.

"MR. RAYAS: We understand that. But I think that most of the people would like to have the time to be able to at least be able to ratify or sanction this. Like I say, I think they're being pulled into something they know nothing about. The ones that do understand a little bit are very much against it.

"THE COURT: Thank you." R.T. at 33–34.

A few others from the audience asked to speak in opposition and were permitted to do so. When Ms. Loya referred to a provision by which a woman could replace a man who had more seniority, the court took pains to explain:

"THE COURT: Well, this whole agreement is trying to create a balance. It is designed over the period of time in the future that this will solve the problem.

"It is not a bit unusual in civil rights cases to try to overcome a class discrimination by this method of training, incentive pay and preference. This is what it is designed to do. To overcome the problems that the class and the individual members of the class have complained about." R.T. at 23–24.[4]

I do not find that the hearing on the approval of the settlement lacked "reasoned responses." To every objection raised at the hearing the court gave explanations or responses. The discussion disclosed an understanding of the proposed agreement and a desire to explain it to those who obviously did not understand it.

Also of concern to the majority is the fact that of the nine representative plaintiffs, five opposed the settlement. Their opposition was first expressed when a petition was filed with the court on January 18, 1974 (the last day for filing objections) which included the names of five of the representative plaintiffs. Two of the five

withdrew their objections later in open hearing. (R.T. at 4–5).[5]

Finally the majority is concerned about the effect of the proposed settlement on employees not members of the class—"presumably all Anglo males." None of them are shown as objectors. It is difficult to believe that over the protracted period of discussion, negotiation, and hearing and the comprehensive posting and publication, the Anglo male employees would not have known of the problem or taken an interest in the settlement if it appeared to be prejudicial to their interests. Furthermore, I would assume that the EEOC, as a neutral agency, would not knowingly permit discrimination, direct or inverse, against an unrepresented group and that Basic would have the same view.

It appears clear that the policy of both state and national governments with respect to the resolution of discrimination in employment practices is to obtain it by conference, conciliation and settlement and not by extended litigation. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 846 (5th Cir.1975), *cert. denied* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *Air Line Stewards, etc., Local 550 v. American Airlines, Inc.,* 455 F.2d 101 (7th Cir.1972). In *Dent v. St. Louis-San Francisco Ry. Co.,* 406 F.2d 399, 402 (5th Cir.1969) the court said:

---

4. That the court was clearly correct is established by a reading of the provision in the agreement to which reference was made. Section VII 2(e) provides:

"Until such time as 20% of High Bracket Jobs at a plant are held by Females, at least *every other* High Bracket Job Vacancy or new opening at the plant will be offered, in order of Plant seniority, to all qualified Female bidders who have the experience and skill necessary to perform the High Bracket Job, before any male, regardless of his seniority, is permitted to bid for the High Bracket Job or before any male is hired to fill the Vacancy or opening." (Emphasis supplied).

5. Of the total class comprising some 2,700 members only 116 were objectors by way of signing a petition. They were given a chance

to speak at the hearing. Only Ms. Dimas said anything. Her statements at the hearing were more in the nature of questions which the court undertook to explain rather than objections. Only two of the 2,700 joined in the appeal and neither was a representative plaintiff in the action. Thus, approximately 4 percent constituted the "dissidents" insofar as the record shows. R.T. at 15. This compares with 20 percent of objectors in an approved settlement which was approved in *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). The court said there, "The drafters of Rule 23 chose as a means of protecting the class the requirement that the district court approve the settlement. They did not require rejection of a settlement on objection of a given part of the class." 494 F.2d at 803.

"Thus it is quite apparent that the basic philosophy of these statutory provisions is that voluntary compliance is preferable to court action and that efforts should be made to resolve these employment rights by conciliation both before and after court action."

Here, it appears that a massive amount of time, effort and talent have gone into a conciliation agreement with the positions of all sides represented. No real substantive or even procedural issues have been clearly joined. Because the problems which concern the majority of the panel (if, in fact, they are problems) were never presented to the trial court at the time and place set for hearing objections, I would affirm the action of the district court and bring this case to a conclusion.