8 F.3d 1370
 Fed. Sec. L. Rep. P 97,816, 27 Fed.R.Serv.3d 349
 John V. TORRISI, Plaintiff-Appellee,
and
James Lazar, Objector-Appellant,
v.
TUCSON ELECTRIC POWER COMPANY, et al., Defendants-Appellees.
(Two Cases)
In re TUCSON ELECTRIC COMPANY SECURITIES LITIGATION. (Two Cases)
John V. TORRISI, Plaintiff-Appellee,
and
Patricia Reilly, Plaintiff-Appellant,
v.
TUCSON ELECTRIC POWER COMPANY; Thomas Weir, et al.,
Defendants-Appellees.
 Nos. 92-15550, 92-15556 and 92-15557.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 13, 1993.
Decided Nov. 3, 1993.
 
 Daniel W. Meek, Portland, OR, for objector-appellant Lazar.
 Patricia Reilly, pro se for objector-appellant Reilly.
 Ralph L. Ellis, Abbey & Ellis, Melvyn I. Weiss, Milberg, Weiss, Bershad, Huynes & Lerach, New York City, and Stanley Wolfe, Berger & Montague, Philadelphia, PA, for plaintiffs-appellees.
 Thomas M. Pace, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, liaison counsel for the plaintiff.
 Charles C. Platt, LeBoeuf, Lamb, Leiby & MacRae, New York City, and Dennis R. Nelson, Tucson Elec. Power Co., Tucson, AZ, for defendants-appellees.
 Before: KOZINSKI, THOMPSON and T.G. NELSON, Circuit Judges.
 Appeal from the United States District Court for the District of Arizona, William P. Copple, Senior District Judge, Presiding.
 DAVID R. THOMPSON, Circuit Judge:
 
 OVERVIEW
 
 1
 Appellants James Lazar and Patricia Reilly appeal the district court's approval of a $30 million settlement of a class-action suit brought against Tucson Electric Power ("Tucson"), its executive officers and directors.
 
 
 2
 Lazar contends the notice of proposed settlement was improper because it was not timely and because it failed to inform class members of what they could expect to receive from the settlement. He also contends the settlement was inadequate and the amount of attorney fees awarded to counsel for the class was excessive. He argues further that class members were improperly divided into two subclasses, that the two subclasses were wrongly determined to be entitled to different portions of the settlement fund, and that the two subclasses should have been represented by separate legal counsel. Finally, he contends his counsel is entitled to fees from the common settlement fund, because the fund will benefit from interest earned on class counsel's fee award during the pendency of this appeal.
 
 
 3
 Reilly, in addition to joining arguments made by Lazar, contends that the notice was inadequate because it failed to inform class members of the class attorneys' self-interest in settling the case. She also argues that the district court should have appointed a special master to look into the propriety of the settlement, and that the settlement hearing conducted by the district court was a sham, because the court had previously made up its mind to approve the settlement.
 
 
 4
 We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
 
 FACTS
 
 5
 The class consisted of purchasers of Tucson stock who suffered losses as a result of alleged fraud and violations of the securities laws. Under the terms of the settlement, the class was divided into two subclasses. Class members who bought stock during the class period, but after July 18, 1989, were entitled to only one-fourth the recovery allocated to members who bought stock on or before that date. The reason for this division was that on July 18, 1989 adverse information was released which caused a precipitous drop in the market price of Tucson's shares, alerting subsequent purchasers to Tucson's significant financial problems.
 
 
 6
 The source of the $30 million settlement was from Tucson's officers' and directors' liability insurance. This was the maximum amount of available insurance, and the only significant source of money to fund the settlement.
 
 
 7
 The settlement was agreed upon, subject to court approval, in late 1991. On December 11, 1991, the district court ordered that notice of the proposed settlement be sent to known class members. It also ordered publication in the Wall Street Journal and the New York Times. The December 11, 1991 order set February 6, 1992 as the last day to receive written objections and February 20, 1992 as the date for a hearing on approval of the settlement and class counsel's request for attorney fees.
 
 
 8
 The notice was published, and on January 6, 1992 it was mailed to 76,700 individual stockholders and to 277 brokerages, banks and institutions, which held shares in their street names. All names and addresses were generated from Tucson's stockholder lists. The brokerages, banks and institutions provided Tucson with the names and addresses of 36,000 additional beneficial owners of shares. Tucson mailed the notice to these persons as their names and addresses were made known to it, the last mailing occurring on February 11, 1992.
 
 
 9
 The notice stated the aggregate amount of the proposed settlement, but it did not inform class members how they might calculate their individual shares of the settlement proceeds. The notice also advised the class that anyone who did not want to participate in the settlement could "opt out" by February 6, 1992.
 
 
 10
 The settlement hearing was held February 20, 1992. At that hearing, the district court considered objections which had been received from class members, rejected challenges to the settlement and the adequacy of the notice, approved the settlement, and awarded class counsel $7.5 million in attorney fees, which was 25% of the $30 million settlement. This appeal followed.
 
 DISCUSSION
 
 11
 * Adequacy of the Notice
 
 
 12
 Lazar and Reilly first contend that the notice of the proposed settlement failed to satisfy due process requirements because it did not contain enough information to enable individual class members to calculate what they would get out of the settlement. Lazar further argues that the notice's timing was inadequate to satisfy both due process and Federal Rule of Civil Procedure 23(c)(2).[1] Finally, Reilly argues that the notice was defective because it did not state class counsel's self-interest in settling the case.
 
 
 13
 We review de novo whether notice of a proposed settlement satisfies due process. In re Cement and Concrete Antitrust Litigation, 817 F.2d 1435, 1440 (9th Cir.1987), rev'd on other grounds, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). We also review de novo whether the timing of a notice satisfies Rule 23(c)(2).
 
 
 14
 A. Did the content of the notice violate due process?
 
 
 15
 In Marshall v. Holiday Magic, Inc., 550 F.2d 1173 (9th Cir.1977), objectors to the settlement of a class action made the same argument Lazar and Reilly make here. They "argue[d] that the notice [of a proposed settlement and hearing on it] did not fairly apprise class members of their positions because it did not specify their potential recovery." Id. at 1177. We stated that their potential recovery was "a matter of conjecture since it was unknown how many class members would opt out or submit claims." Id. at 1177-78. We held that the aggregate amount of the proposed settlement and the formula for computing recoveries was all that was required. Id. at 1178.
 
 
 16
 Here, the settlement notice states that the aggregate amount of the settlement is $30 million. It also states that each class member's recovery will be proportional to "Recognized Loss," which it defines as 100% of losses resulting from stock bought during the first period ending July 18, 1989, and 25% of losses resulting from stock bought during the second period. The notice clearly stated the aggregate amount of the settlement and the formula for computing awards. The notice was adequate under Holiday Magic. See also In re Cement and Concrete, 817 F.2d at 1440 ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.' ").
 
 
 17
 B. Did the timing of the notice violate due process or Rule 23(c)(2)?
 
 
 18
 Due process requires that notice provide affected parties with the opportunity to be heard. In re Cement and Concrete, 817 F.2d at 1440. Similarly, Rule 23(c)(2) requires "the best notice practicable under the circumstances." Fed.R.Civ.P. 23(c)(2).
 
 
 19
 The notice was mailed to some shareholders as late as February 11, 1992. Lazar contends that because the deadline for filing objections or opting out was February 6, 1992 and the settlement hearing was February 20, 1992, the timing of the notice was not the best practicable under the circumstances nor was it adequate. We disagree.
 
 
 20
 Tucson mailed the notice on January 6, 1992 to 76,700 shareholders at their addresses obtained from its stockholder lists. On the same day it mailed the notice to 277 brokerages, banks and institutions who held shares in their street names for the beneficial owners. These brokerages, banks and institutions responded to the mailing by providing Tucson with approximately 36,000 additional names and addresses of shareholders. Tucson mailed the notice to these shareholders as their names and addresses were received. This mailing continued through February 11, 1992. In all, the notice was mailed to approximately 113,000 shareholders. Only 20 objections were received. All were considered by the district court.
 
 
 21
 In Holiday Magic, we approved the timing of a notice which was mailed 26 days before the deadline for opting out of a settlement. Holiday Magic, 550 F.2d at 1178. While Lazar is correct in pointing out that Holiday Magic involved a class likely to be better informed than the class here, in Holiday Magic, we cited with approval Milstein v. Werner, 57 F.R.D. 515 (S.D.N.Y.1972). In Milstein, the court approved a notice mailed 38 days before a scheduled hearing in a case similar to this, a class action by corporate shareholders. Id. at 518. The notice here was mailed 31 days before the deadline for written objections and 45 days before the hearing. It was mailed to 76,700 shareholders who held their shares in their individual names. As to these shareholders, we have no difficulty concluding the notice was timely.
 
 
 22
 Lazar also contends the notice provided to approximately one-third of the shareholders--those who held their shares in street name--was untimely, thereby depriving a significant number of shareholders of the opportunity to object to the settlement.[2] But the question before us today is not whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement. If an individual shareholder later claims he did not receive adequate notice and therefore should not be bound by the settlement, he can litigate that issue on an individual basis when the settlement is raised as a bar to a lawsuit he has brought.
 
 
 23
 It is important to consider the context in which the settlement was reached and its approval was sought. Tucson's position was precarious. There was a pending bankruptcy proceeding against it, and the defendants had a motion for summary judgment pending; liability had not been established and the defendants were asserting defenses which had to be taken seriously. The settlement had been achieved after lengthy negotiations among various diverse groups, including Tucson's creditors. Finally, the insurance carrier, which was to provide the $30 million to fund the settlement, had initially refused to contribute anything, and had asserted disclaimers and reservations of rights. In sum, it was critical that the settlement be presented to the district court promptly for its consideration.
 
 
 24
 Altogether, the timing of the notice was not inadequate.
 
 
 25
 C. Did the notice fail to explain class counsel's self-interest in settling the case?
 
 
 26
 The notice provided that class counsel would request a fee award of 30% of the settlement, or $9 million. This was adequate notice of class counsel's interest in the settlement.
 
 II
 Adequacy of the Settlement
 
 27
 We review for abuse of discretion a district court's approval of a class action settlement. Class Plaintiffs v. Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992).
 
 
 28
 A settlement should be approved if "it is fundamentally fair, adequate and reasonable." Id. This determination requires
 
 
 29
 a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.
 
 
 30
 Officers for Justice v. Civil Serv. Comm'n of San Francisco, 688 F.2d 615, 625 (9th Cir.1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). This list is not exclusive and different factors may predominate in different factual contexts. Id.
 
 
 31
 Here one factor predominates to make clear that the district court acted within its discretion. That factor is Tucson's financial condition. At the time of the settlement it was involved in negotiations with its creditors to restructure its debt and had had an involuntary bankruptcy petition recently filed against it. It had declared a payment moratorium on its debts, and was attempting to obtain regulatory permission to raise its rates to permit it to continue operating. It reached an agreement with its other creditors at roughly the same time as the settlement in this suit was agreed upon and there was evidence that the assent of other creditors would probably have been withdrawn if this settlement had failed. This could have led to a bankruptcy reorganization which would have left little if anything for class members.
 
 
 32
 Lazar argues that Tucson's financial condition was not as bad as it was made out to be. He asserts that the evidence of Tucson's financial plight was incredible, because it was based on statements made by Tucson's counsel. This argument is meritless. The statements made by Tucson's counsel were included in his sworn affidavit, and were based upon facts within his personal knowledge. Lazar offers nothing but conclusory argument to the contrary.
 
 
 33
 Lazar also contends the district court should have rejected the settlement and let the case proceed to trial so that the alleged wrongdoers could be put in the dock and held up to public scrutiny. This is not an adequate reason to reject a $30 million settlement and commit the class to the risks of further litigation.
 
 
 34
 Both Lazar and Reilly argue that at the time of the settlement, Tucson had its own lawsuit it was pursuing against Southern California Edison ("SCE") for interference with contract. In that lawsuit, Tucson was requesting $6.7 billion. Lazar and Reilly suggest that with such an asset, Tucson could have come up with a much larger amount to satisfy the class claims.
 
 
 35
 While it is true that recovering $6.7 billion would have changed Tucson's fortunes, the $6.7 billion was not an asset. It was a claim which was contingent on a best case result in a lawsuit. The reality of the situation was that the settlement had to be negotiated based upon assets which could be called upon to fund it. The contingent $6.7 billion claim against SCE was not such an asset. That claim was eventually settled for $40 million, but by then the settlement had been concluded and approved by the court.
 
 
 36
 In addition to Tucson's financial condition, other factors point to the conclusion that the settlement was fair. The inherent risks of litigation, the class' overwhelming positive reaction, the opinion of two sets of experienced counsel, and the cost, complexity and time of fully litigating the case all suggest that this settlement was fair.
 
 
 37
 We conclude that the district court did not abuse its discretion in approving the settlement.
 
 III
 Class Counsel's Attorney Fees
 
 38
 We review the award of attorney fees for abuse of discretion. Drucker v. O'Brien's Moving & Storage, Inc., 963 F.2d 1171, 1172 (9th Cir.1992). In common fund cases such as this, we have established 25% of the common fund as the "benchmark" award for attorney fees. Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir.1990); Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir.1989). This "benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." Six Mexican Workers, 904 F.2d at 1311.
 
 
 39
 There are no special circumstances here which indicate that the 25% benchmark award is either too small or too large. The hours class counsel devoted to the case, when computed as a lodestar amount, total $3 million. Class counsel, however, have the case on a contingency. Moreover, it is a double contingency; first, they must prevail on the class claims, and then they must find some way to collect what they win. Class counsel was committed to carrying the case through the conclusion of litigation by trial and appeal, if that would be in the best interests of the class. The district court determined it would not be. It determined that it was in the best interests of the class to settle the case for the $30 million settlement class counsel negotiated.
 
 
 40
 The 25% contingent fee rewarded class counsel not only for the hours they had in the case to the date of the settlement, but for carrying the financial burden of the case, effectively prosecuting it and, by reason of their expert handling of the case, achieving a just settlement for the class.
 
 
 41
 We cannot say the district court abused its discretion in applying the benchmark award for attorney fees.
 
 IV
 Settlement Hearing Procedures
 
 42
 Reilly argues that the district court behaved improperly in approving the settlement. She argues that the hearing was a sham because the district judge had provisionally decided to approve the settlement. She also argues that the district court violated its "fiduciary duty" to the class by not appointing a special master to investigate the propriety of the settlement. We reject these arguments.
 
 
 43
 There is nothing in the record to suggest that the district court prejudged the question whether to approve the settlement. To the contrary, the record shows that the district court received and considered objections filed by the few shareholders who objected to the settlement, and listened to the objections of those who chose to appear and argue at the hearing. Only after carefully reviewing all of the objections and considering relevant matters pertaining to the fairness of the settlement did the district court approve it.
 
 
 44
 The court was under no obligation to appoint a special master to investigate the propriety of the settlement. The court was in a position to judge the merits of the settlement based upon its familiarity with the case and the evidence presented to it. There were no procedural errors in the district court's conduct of the settlement hearing.
 
 V
 Disparate Treatment of the Two Classes
 
 45
 Lazar argues that the disparate treatment of the two subclasses was irrational and that they should have been separately represented.
 
 
 46
 A. Was the disparate treatment irrational?
 
 
 47
 Lazar contends it was irrational to select July 18, 1989 as the date to divide the class, because those stockholders who bought their shares after that date bought them at a better price to book value ratio. He argues that these purchasers invested more wisely when they bought their shares, and as a result they should share equally with those who bought their shares on or before July 18, 1989. This argument lacks merit. The reason stockholders were treated differently depending on whether they bought their shares after July 18, 1989, had nothing to do with what they thought about Tucson's book value. The reason for treating the two subclasses differently was based on events that began to unfold on July 18, 1989.
 
 
 48
 On that date, Tucson announced the resignation of Einar Greve, its chairman and CEO. It also announced it was considering a cut in the size of its dividend. Standard and Poors lowered Tucson's credit rating. On July 19, 1989, the market reacted. The stock price dropped from $33.50 per share to $27 per share. These events, and particularly the market reaction of a one-day drop of $6.50 in the price of the shares, would necessarily have put investors on notice that Tucson was in financial trouble, just as the district court found. Those who bought their shares on or before the dividing date were more likely to have bought in reliance on market values inflated due to the alleged wrongdoing of Tucson's responsible officers and directors.
 
 
 49
 It was not irrational to use the July 18, 1989 date to divide the class into two subclasses.
 
 
 50
 B. Should the two subclasses have been separately represented by legal counsel?
 
 
 51
 Lazar argues that the subclasses should have been separately represented due to an inherent conflict of interest. He points out that in dividing up the $30 million common fund, the claims of members who bought their shares on or before July 18, 1989 would be computed based on 100% of their losses, while the claims of members who bought after that date would be computed on 25% of their losses. Separate counsel, Lazar contends, should have represented each subclass to assure that the July 18, 1989 date was an appropriate date to divide the class, and that the allocation of 100% of losses to the first group and 25% to the second was fair. Lazar further contends that the district court erred in not providing a reasoned explanation why separate representation for the two subclasses was unnecessary.
 
 
 52
 The district court did not directly address the separate representation question, but in finding the settlement fair, adequate and reasonable the court implicitly found that representation was adequate. Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1284 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992) (citing In re Corrugated Container Antitrust Litigation, 659 F.2d 1337, 1340 (5th Cir.1981)). Here, notice of the settlement was given to 113,000 class members. Only twenty objections were filed.[3] Only Lazar and Reilly have appealed, and even they have not opted out of the settlement.
 
 
 53
 These circumstances suggest that the appellants are spoilers. Their concerns could have been addressed in their individual lawsuits if they had elected to opt out of the settlement. As we said in Holiday Magic,
 
 
 54
 [a]ppellants were not forced into the position of having to predict their interests would be adequately represented. They could determine whether there had been adequate representation of their interests by reviewing the terms of the settlement. If they were dissatisfied, they could opt out of the class. This opportunity to opt out after knowing the terms of a proposed settlement is unusual in the class action context and serves to protect the interests of class members. See Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 33 (3d Cir.1971). Appellants' rights were fully protected by this right to opt out.
 
 
 55
 Holiday Magic, 550 F.2d at 1177.
 
 
 56
 Lazar relies on Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832 (9th Cir.1976). He argues that Mandujano compels us to reverse the district court's approval of the settlement, because the district court did not give an express, detailed response to the objections. Id. at 836. We disagree.
 
 
 57
 Initially we note that Mandujano was a class action prosecuted under Federal Rule of Civil Procedure 23(b)(2), with no opportunity for class members to opt out; class members here had that chance, because this class action was prosecuted under Federal Rule of Civil Procedure 23(c)(2)(A). As Holiday Magic makes clear, the opportunity to opt out can alleviate our concern about potential class conflict. See Holiday Magic, 550 F.2d at 1177.
 
 
 58
 Moreover, in Holiday Magic, we considered the Mandujano requirement of a detailed response to objections, and found it inapplicable. Holiday Magic, 550 F.2d at 1179. In Mandujano, we had serious concerns about the fairness of the settlement to some classes of plaintiffs, Mandujano, 541 F.2d at 836, and more than one-half of the representative plaintiffs were on record as opposing the settlement. Id. at 837. That was not the case in Holiday Magic; and it is not the case here. What we said in Holiday Magic applies to this case: "We believe that the failure of the district court to give detailed responses to appellants' objections does not call for throwing out a settlement in a complicated lawsuit for a class of more than 31,000 people." Holiday Magic, Inc., 550 F.2d at 1179. This case involves a class of approximately 113,000 people.
 
 VI
 Fees for Lazar's Counsel
 
 59
 Finally, Lazar argues that his counsel is entitled to 25% of the amount by which interest accruing during this appeal increases the value of the settlement. He acknowledges that interest on the $22.5 million which is the class' share of the settlement is compensation for the time delay the class has experienced in receiving payment. However, by order of the district court, interest on the $7.5 million attorney fees awarded class counsel also accrues to the class. Thus, interest accrues to the benefit of the class during the pendency of this appeal in a way greater than simply compensating the class for the delay in receiving its share of the settlement proceeds.
 
 
 60
 We reject Lazar's argument. The benefit to the class from interest it will earn on class counsel's attorney fee award is not the kind of benefit which will support an award of fees to Lazar's counsel. None of the cases Lazar relies on involved an award of fees merely because a delay caused interest to accrue. See White v. Auerbach, 500 F.2d 822, 829-30 (2d Cir.1974); Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc., 481 F.2d 1045, 1053 (2d Cir.), cert. denied, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973). In Alpine Pharmacy, the court used accrued interest to justify an attorney fee award, but it did so because the lawyers who were rewarded had created the arrangement under which one class received all the interest on certain settlement funds, not because they merely caused delay allowing interest to accrue under a preexisting arrangement. Id.
 
 
 61
 Were we to grant Lazar's request for fees for the reason he suggests, we would encourage appeals for no purpose other than to delay the finality of litigation. We will not do that.
 
 
 62
 AFFIRMED.
 
 
 
 [1]
 Rule 23(c)(2) provides in relevant part that:
 The court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.
 Fed.R.Civ.P. 23(c)(2).
 
 
 [2]
 Lazar and Reilly, the only objectors who have appealed the district court's approval of the settlement, were among the approximately 36,000 Tucson shareholders who held their shares in street name. Lazar and Reilly received the notice, filed objections, and opposed the settlement. In addition, Reilly participated in the settlement hearing and argued against approval of the settlement and attorney fees. Neither Lazar or Reilly elected to opt out
 
 
 [3]
 We cannot tell from the record before us how many shareholders may have received notice after the time for filing objections had expired. As we have previously stated, however, given all of the circumstances of this case, the timing of the notice was not inadequate. See supra, page 1375