Lawrence EPSTEIN; John Linder; Jane Rockford, as trustee of the Michael J. Rockford Trust; Maurice Karlin; Ruth Karlin; Beth Ann Karlin; Bert P. Karlin, Plaintiffs–Appellants,

v.

MCA, INC.; Matsushita Acquisition Corporation; Matsushita Electric Industrial Co., LTD; Matsushita Holding Corporation; Lew Wasserman; Sidney J. Sheinberg, Defendants–Appellees.

No. 92–55675.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 4, 1996.

Decided Oct. 22, 1997.

---

Henry Paul Monaghan, Harold Edgar, New York City; Irving Malchman, Roger W. Kirby, Peter S. Linden, Kaufman, Malchman, Kirby & Squire, New York City, for plaintiffs-appellants.

Alan B. Morrison, Brian Wolfman, Washington, DC, for amici curiae plaintiffs-appellants.

Barry R. Ostrager, Simpson, Thatcher & Bartlett, New York City; Eleanor M. Fox, New York City; Geoffrey C. Hazard, Jr., Philadelphia, Pennsylvania, for defendants-appellees.

Daniel J. Popeo, Richard A. Samp, Washington, DC, for amici curiae defendants-appellees.

Before: NORRIS, WIGGINS, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge WILLIAM A. NORRIS; Dissent by Judge O'SCANNLAIN, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

This case is before us on remand from the United States Supreme Court. In *Matsushita Electric Industrial Co. v. Epstein*, —— U.S. ——, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (*"Matsushita"*), the Court reversed our judgment in *Epstein v. MCA, Inc.*, 50 F.3d 644 (9th Cir.1995) (*"Epstein I"*), and remanded "for proceedings consistent with this opinion." *Matsushita*, —— U.S. at ——, 116 S.Ct. at 884.

The case is a class action brought by former MCA shareholders who surrendered their stock in response to a tender offer by Matsushita. In *Epstein I*, the named plaintiffs ("the Epstein plaintiffs") contended, *inter alia*, that Matsushita's tender offer violated the so-called "all-holder, best-price" rule of SEC Rule 14d–10[1] by paying a premium for the stock of MCA's chairman and chief

executive officer, Lew Wasserman, and MCA's chief operating officer, Sidney Sheinberg.[2] The district court awarded summary judgment to the defendants, and the Epstein plaintiffs appealed.

In *Epstein I* we reversed the summary judgment for Matsushita, holding that its agreement to purchase Mr. Wasserman's stock for consideration different from what it offered other shareholders violated Rule 14d–10, *see Epstein I*, 50 F.3d at 653–57, and that there was a material issue of fact as to whether a $21–million dollar payment to Mr. Sheinberg was legitimately made as incentive compensation for past services or was a premium for his stock paid in violation of Rule 14d–10. *See id.* at 657–59. We rejected Matushita's argument that there was no private right of action under § 14(d)(7) of the Williams Act, following the decisions of the Second and Third Circuits on that point.[3] *See id.* at 649–52. We also rejected Matsushita's argument that its purchase of Mr. Wasserman's stock could not have violated Rule 14d–10 because his stock was not exchanged until one hour after Matsushita accepted the tendered MCA shares for payment. *See id.* at 654–57. We also held that the district court had abused its discretion in refusing to certify the class because "[t]he claims of every tendering shareholder turn on identical facts and law—regardless of the identity or circumstances of the particular shareholder." *Id.* at 668. Finally, we affirmed the district court's dismissal of the "aiding and abetting" claims against MCA and Messrs. Wasserman and Sheinberg personally in light of the Epstein plaintiffs' concession on the issue. *See id.* at 665 n. 29.

None of these rulings on the merits of the Rule 14d–10 claims were disturbed by the Supreme Court in *Matsushita*. The Court reversed our judgment and remanded for further proceedings solely on the basis of the

---

**1.** Rule 14d–10, 17 C.F.R. § 240.14d–10 (1994), is promulgated under Section 14(d)(7) of the 1968 Williams Act Amendments [hereinafter "The Williams Act"] to the Securities Exchange Act of 1934, 15 U.S.C. § 78n(d)(6)-(7) (1994) [hereinafter "The Exchange Act"].

**2.** The Epstein plaintiffs also claimed that the premiums paid to Messrs. Wasserman and Sheinberg violated SEC Rule 10b–13, 17 C.F.R.

§ 240.10b–13 (1994). We did not consider the Rule 10b–13 claim in *Epstein I* because any relief that the Epstein plaintiffs could have obtained under Rule 10b–13 was also available under Rule 14d–10. *See Epstein I*, 50 F.3d at 648 n. 5.

**3.** *See Polaroid Corp. v. Disney*, 862 F.2d 987, 996 (3d Cir.1988); *Field v. Trump*, 850 F.2d 938, 946 (2d Cir.1988).

first question presented in Matsushita's petition for the writ of certiorari: "Whether a federal court can withhold full faith and credit from a state court final judgment approving a class action settlement simply because the settlement released exclusively federal claims."[4] *Matsushita Electric Indus. Co. v. Epstein,* 515 U.S. 1141, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995) (granting certiorari limited to Question 1 presented by the petition for writ of certiorari); *see also Matsushita,* —— U.S. at ——, 116 S.Ct. at 884 (remand order).

On remand, the Epstein plaintiffs press anew an argument that we found unnecessary to address in *Epstein I:* that we should withhold full faith and credit from the Delaware judgment because it was entered into in violation of the due process right of the absent class members to adequate representation at all times. We now turn to that question.

## I

Matsushita contends that we are barred from addressing the merits of the Epstein plaintiffs' claims of inadequate representation. Matsushita makes three arguments in support of this contention:

(1) The Supreme Court's decision in *Matsushita* did not leave the issue open on remand;

(2) The issue of the adequacy of representation was fully and fairly litigated in the Delaware Court of Chancery;

(3) The Epstein plaintiffs are estopped from raising the adequacy of their representation collaterally because they did not raise it by intervening in the Delaware proceeding.

## A

■ In arguing that the "[t]he opinion of the Supreme Court leaves no issue open on remand," Appellees' Br. at 1, Matsushita either mischaracterizes or disregards the unambiguous statements in the record to the contrary:

1. Matsushita fails to cite the Court's order granting certiorari, which limited the question it would review to Question 1 in Matsushita's petition. *See Matsushita Electric Industrial Co. v. Epstein,* —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995); *see also Matsushita,* Pet. for Cert., at i ("1. Whether a federal court can withhold full faith and credit from a state court final judgment approving a class action settlement simply because the settlement includes a release of exclusively federal claims.").

2. Matsushita fails to include the first sentence of the Court's opinion which limited the question presented precisely the way Matsushita stated it in its petition for certiorari:

This case presents the question whether a federal court may withhold full faith and credit from a state-court judgment approving a class-action settlement simply because the settlement releases claims within the exclusive jurisdiction of the federal courts.

*Matsushita,* —— U.S. at —— – ——, 116 S.Ct. at 875–76.

3. Matsushita, although quoting various excerpts from the Court's opinion, fails to quote the following explicit statement by the Court that it did not address the due process claim:

We need not address the due process claim [of inadequate representation] ... because it is outside the scope of the question presented in this Court. *See Yee v. Escondido,* 503 U.S. 519, 533, 112 S.Ct. 1522, 1531, 118 L.Ed.2d 153 (1992). While it is true that a respondent may defend a judgment on alternative grounds, we generally do not address arguments that were not the basis for the decision below. *See Peralta v. Heights Medical Center, Inc.,* 485 U.S. 80, 86, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988).

*Id.* at ——, n. 5, 116 S.Ct. at 880, n. 5.

4. Matsushita also fails to cite the explicit statement in Justice Ginsburg's separate

---

4. The Supreme Court accepted Matsushita's statement of the question presented even though that statement mischaracterized our holding. We did not withhold full faith and credit "simply" because the Delaware judgment released exclusively federal claims. Rather, we withheld full faith and credit because the great disparity

between the state and federal claims—there were no overlapping issues of fact whatsoever (*see Epstein I* at 665–66)—meant that a judgment based upon an adjudication of the state claims could have no issue preclusive effect on the federal claims.

opinion that the due process question of adequate representation remained open on remand, a statement that went unchallenged by any member of the Court:

> Mindful that this is a court of final review and not first view, I do not address the merits of the Epstein plaintiffs' contentions [regarding the adequacy of representation], or Matsushita's counterargument that the issue of adequate representation was resolved by full and fair litigation in the Delaware Court of Chancery. *These arguments remain open for airing on remand.*

*Id.* at ——, 116 S.Ct. at 890 (Ginsburg, J., concurring in part and dissenting in part) (emphasis added).

5. Finally, in arguing that the due process question is not open on remand, Matsushita ignores its *own* assertions to the Court that the question was not before it for decision. In their brief, the Epstein plaintiffs invited the Court to address the adequacy of representation issue, notwithstanding that it was outside the scope of the sole question on which the Court had granted certiorari. *See Matsushita* Resp. Br. at 34–45. In its Reply Brief, Matsushita responded:

> A. The Ninth Circuit Opinion is Not Predicated Upon Any Due Process Issue.
>
> Respondents invite this Court to find constitutional infirmity in the Delaware proceedings based on alleged inadequate representation and judicial supervision. Resp. Br. at 34–45. As respondents concede, the Ninth Circuit's holding is *not* predicated on these fact-specific issues. Resp. Br. at 8. Accordingly, this Court should decline to address them.

*Matsushita* Reply Br. at 13.

Given this state of the record, we must agree with the Epstein plaintiffs that Matsushita's argument that the due process question is not open on remand is. "inexplicable." Reply Br. at 4. Matsushita attaches no weight to the Supreme Court's clear disclaimer that "We need not address the due process claim," *Matsushita*, —— U.S. at ——, n. 5, 116 S.Ct. at 880, n. 5., and all the other references in the record that reaffirm this disclaimer.

Instead, Matsushita attempts to get around the Court's unambiguous disclaimer.

First, it seizes upon language in the Court's opinion concerning Delaware preclusion law and lifts it out of context. "State-court approval of the settlement would have the collateral effect of preventing class members from prosecuting their claims in federal court." *Matsushita*, —— U.S. at ——, 116 S.Ct. at 879; *accord* Appellees' Br. at 12. While an accurate summary of the Supreme Court's reading of Delaware preclusion law, this passage lends no support to the argument that the Supreme Court addressed, let alone disposed of, the Epstein plaintiffs' inadequate representation claim.

Matsushita's position that the Court in *Matsushita implicitly* held that the Delaware proceeding satisfied due process reads volumes between the lines. When taken in the face of the Court's explicit announcement that it did *not* render such a holding, we agree with the Epstein plaintiffs that it becomes nothing less than "incomprehensible." Appellants' Br. at 5.

Matsushita's second ground for arguing that adequacy of representation is not open on remand rests on the very footnote—from which it selectively excerpts—in which the Court expressly stated that it was *not* addressing due process. Matsushita misleading quotes only the first part of the footnote, which reads as follows:

> A part [sic] from any discussion of Delaware law, respondents contend that the settlement proceeding did not satisfy due process because the class was inadequately represented.... Respondents make this claim in spite of the Chancery Court's express ruling, following argument on the issue, that the class representatives fairly and adequately protected the interests of the class....

*Id.* at ——, n. 5, 116 S.Ct. at 880, n. 5 (citations omitted). Matsushita omits the very next sentence of the footnote, however, in which the Court made clear that it was not disposing of the due process claim.

> We need not address the due process claim, however, because it is outside the scope of the question presented in this Court.

*Id.*

Matsushita would have us believe that the Court was "winking" at us—saying that it

was not doing exactly what it was doing. The only reasonable interpretation of these sentences, however, is that the Court was simply stating the claim of the Epstein plaintiffs that their representation in the Delaware proceeding was constitutionally inadequate.

In sum, we reject Matsushita's argument that the Supreme Court did not leave the due process issue open on remand. The Court laid out an unambiguous contrary intention in its statement of the question presented and in footnote five, and no voice was raised against Justice Ginsburg's explicit statement that the issue of adequacy of representation "remain[ed] open for airing on remand." *Id.* at ——, 116 S.Ct. at 890 (Ginsburg, J., concurring in part and dissenting in part).

### B

Next we address Matsushita's argument that the Delaware settlement judgment precludes the Epstein plaintiffs from "relitigating" the issue of adequacy of representation under Delaware issue preclusion law. It claims that adequacy of representation was actually litigated by objectors at the Delaware fairness hearing, and that other Delaware courts would therefore give preclusive effect to the Chancery Court's determination that representation of the absent class members was adequate. Appellees' Br. at 16–18, 21–24, 22 n. 6. Therefore, Matsushita argues, under 28 U.S.C. § 1738, we too must attach issue preclusion. *See id.* at 23.

The Epstein plaintiffs argue in response that the Delaware judgment raises no issue preclusion bar to the question of constitutional adequacy of representation. First, they contend, the objectors did not actually litigate the issue at the Delaware fairness hearing, as is required under Delaware issue preclusion law. *See* Appellants' Br. at 21–23; Reply Br. at 10. More broadly, the Epstein plaintiffs contend that individual, uncertified objectors in a class action cannot constitutionally bind absent class members on the issue of adequacy of representation. *See id.* at 17–18. We consider each contention in turn.

### 1

Under Delaware law, issue preclusion attaches only when a question of fact essential to the judgment has been actually litigated and determined by a valid and final judgment. *See Messick v. Star Enterprise,* 655 A.2d 1209, 1211 (Del.1995) ("The test for applying collateral estoppel requires that (1) a question of fact essential to the judgment, (2) be litigated and (3) determined (4) by a valid and final judgment.") (internal quotations omitted) (emphasis added); *Orange Bowl Corp. v. Jones,* 1986 WL 13095, at * 2 (Del.Super.1986); *Evans v. Frank E. Basil, Inc.,* 1986 WL 3973, at * 2 (Del.Super.1986). The Delaware record shows clearly that the issue of adequacy of representation was not litigated during the settlement proceedings.

First, the notice to class members said nothing about adequacy of representation. Instead, the notice stated that the purpose of the settlement hearing was to determine "(a) the fairness, reasonableness, and adequacy *of the terms of the ... Settlement,* and (b) whether an order and final judgment should be entered approving the proposed settlement." Supplemental Record ("SR") 354 (emphasis added). Whether the class was adequately represented by the named plaintiffs or by class counsel was not an issue noticed for hearing. Thus, absent class members were not on notice that they could have objected to the adequacy of representation at the settlement hearing.

Not surprisingly, the objectors who did appear at the settlement hearing did not litigate the adequacy of their representation. Objector Marion Minton focused solely on the issue of inadequate notice. *See* SR 375. Objector Pamela Minton de Ruiz, in her memorandum to the Chancery Court, framed her objection in terms of collusion, arguing that "[t]he second proposed settlement is collusive and should not be approved." SR 402. Likewise, the Minton objectors argued at the settlement hearing that "this two-cent settlement is collusive." SR 574. Neither of the Minton objectors focused on the much broader issue of whether representation was constitutionally adequate. *See* SR 402–09.[5]

---

5. Since the Chancery Court could have found that representation was inadequate without also finding that it was collusive, litigation of the

collusion issue would not constitute "actual litigation" of adequacy of representation.

Finally, objector William A. Krupman did submit an affidavit to the Chancery Court stating that he opposed the settlement because "the purported class representatives ... had proposed a settlement that benefitted no one but their own attorneys. They did not provide adequate representation." SR 422–23. However, this single blanket statement conflating the non-constitutional question of the fairness of the settlement with the constitutional question of the adequacy of representation hardly qualifies as "actual litigation" of the constitutional issue. Indeed, in his argument at the settlement hearing, objector Krupman did not address the constitutional adequacy of the representation, but argued only that the terms of the settlement were unfair. *See* SR 589–91.

Since the issue of adequacy of representation was never actually litigated in Chancery Court, no Delaware court would attach preclusion to the issue of adequate representation of the absent class members. *See Star Enterprise,* 655 A.2d at 1211. Under § 1738, neither may we. *See, e.g., Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 88, 104 S.Ct. 892, 899–900, 79 L.Ed.2d 56 (1984) (White, J., concurring) (collecting cases).[6]

### 2

■■■ Even if adequacy of representation had actually been litigated by objectors at the fairness hearing, and even if Delaware law would allow an individual objector to bind an absentee on the issue of adequacy of representation—however improbable that might seem—we still could not give full faith and credit to such a judgment because it would violate due process of law. As the

Epstein plaintiffs aptly put it, *"[o]bjectors are objectors, not class representatives."* Reply Br. at 17–18. Binding absentees to any part of a class action judgment "is an act of judicial power," *Epstein I,* 50 F.3d at 667, and that power can only be exercised over absentees when their interests have, in fact, been adequately represented by parties lawfully authorized to represent them. *See, e.g., Richards v. Jefferson Cty., Ala.,* —— U.S. ——, ——, 116 S.Ct. 1761, 1766, 135 L.Ed.2d 76 (1996) ("[O]ne is not bound by a judgment *in personam* in a litigation in which he is not designated as a party ... [except, in a class action, where he] has his interests adequately represented."). It would defy this fundamental principle of our jurisprudence to allow the due process right of absent class members to adequate representation to be litigated by random, volunteer objectors.[7]

Not surprisingly, Matsushita offers no persuasive authority in its attempt to argue against this basic principle. Some of the cases that it cites involve individual litigants, not class members. In *Durfee v. Duke,* 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963), for example—upon which Matsushita relies heavily—the Supreme Court held that an individual who has unsuccessfully challenged subject matter jurisdiction in an initial action can be precluded from raising the issue in a collateral attack on the judgment. *Durfee* was not a class action and says nothing about the rights of absent class members. Some of Matsushita's other cases pre-date *Phillips Petroleum v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), the controlling Supreme Court precedent on the rights of absent class members. *See infra,* Section

---

**6.** It also appears that Delaware courts would not attach preclusion to the Delaware judgment because the Vice Chancellor failed to make a finding, supported by reasons and evidence on the record, that the requirements of Delaware Rule 23 were satisfied. In *Prezant v. De Angelis,* 636 A.2d 915 (Del.1994), the Delaware Supreme Court held that a Court of Chancery is required to "articulate on the record its findings regarding the satisfaction of the Rule 23 criteria and supporting reasoning" before it approves a class action settlement. *Id.* at 925. The only mention of Rule 23 that the Chancery Court ever made in this case was contained in a *pro forma* statement supported by neither reasons nor evidence in the record. *See* Chancery Court's Order and Final

Judgment, at 2 ("[I]t is hereby ... determined that the plaintiffs in these Actions, as representatives of the Settlement Class, have fairly and adequately protected the interests of the Settlement Class and that the maintenance of this action as a class action meets all the requirements of Rule 23(a) and (b)(3) of the Court of the Chancery"). While we need not decide the issue, we are doubtful that this *pro forma* recital satisfies *Prezant.*

**7.** Absent class members are, of course, bound by a judgment on the merits of the class action issues, as for example, the fairness of the settlement.

I.C. *See, e.g., Laskey v. International Union, United Auto., Aerospace & Agric. Implement Workers (UAW),* 638 F.2d 954 (6th Cir.1981). The only case Matsushita cites that offers any help on its proposition that volunteer objectors can litigate the due process rights of absent class members is *Grimes v. Vitalink Communications,* 17 F.3d 1553 (3d Cir.1994). In *Grimes,* the Third Circuit held that objectors may litigate the due process rights of absent class members who have sufficient minimum contacts to support an exercise of personal jurisdiction over them by the forum. It reasons that, so long as an absentee has "minimum contacts" with the forum, he can be bound by the judgment without receiving *Shutts'* safeguards. *See Grimes,* 17 F.3d at 1558–59, 1560 & n. 8. There is nothing in *Shutts,* however—or in any other case—to suggest that *Shutts* offers protection only to those absentees who are beyond the *in personam* reach of the forum. Because *Grimes* conflates the requirements of *in personam* jurisdiction with the due process safeguards that *Shutts* guarantees to absent class members, we respectfully decline to follow it.

Finally, Matsushita raises the alarmist cry that it will sound the death knell to finality in class actions if individual objectors cannot bind absentees on the issue of adequate representation. *See* Appellees' Br. at 2. We of course reject this hyperbole. So does Delaware. In *Prezant v. De Angelis,* 636 A.2d 915 (Del.1994), the Delaware Supreme Court points out that prudent class action defendants can protect themselves from collateral attack. Although they cannot foreclose a subsequent collateral action absolutely, they can minimize the risk by asking for a judicial finding, supported by reasons and evidence in the record, that the plaintiffs' "due process right to adequate representation has been satisfied." *Prezant,* 636 A.2d at 925–26. Such a finding will "help insure" that judgments will be subject to collateral attack only under extraordinary circumstances like those that exist in this case. *See id.* Thus, we disagree with Matsushita that finality of settlements will come to an end if volunteer objectors are not vested with the authority to bind absentees on the issue of the adequacy of class representation.

To repeat, "[o]bjectors are objectors, not class representatives." Reply Br. at 17–18 (emphasis removed). The individual objectors who voluntarily appeared at the fairness hearing were not authorized by the absentees to represent their interests, nor were they certified by the state to do so. Their appearance at the hearing did not bind anyone but themselves to an adjudication of adequacy of representation.

### C

Finally, Matsushita argues that because of the procedures used in the Delaware Chancery Court, the Epstein plaintiffs cannot bring a collateral attack on adequacy of representation. This argument comes in two parts. First, Matsushita argues, the settlement hearing provided a "full and fair opportunity" for absentees to contest the adequacy of their representation. Appellees' Br. at 25. The absentees had a duty to intervene in that hearing if they wished to protect their rights, Matsushita claims, and having failed to do so, they are estopped from bringing a collateral challenge. Second, and more broadly, Matsushita argues that the procedures Delaware had in place foreclose us from *ever* hearing a collateral challenge to adequacy of representation. Matsushita argues that we are limited to reviewing the sufficiency of the *procedures* that Delaware had in place to ensure adequate representation, rather than the adequacy of the representation itself. "[T]he Chancery Court's adherence to Rule 23 procedures satisfies the Due Process Clause as a matter of law," Matsushita continues, and an absent class member's claim on "the merits" of inadequate representation "is far outside the scope of the [collateral] review permitted by . . . the case law of this Court." Appellee's Br. at 30. We agree with the Epstein plaintiffs that both of these arguments are meritless.

### 1

■ Matsushita argues that class members who wish to contest adequacy of representation must intervene during the course of the class action proceedings and do battle with their own representatives in an adversarial contest over the way they are dis-

charging their fiduciary duties. This argument ignores the clear teaching of *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), that a class member is not required to do anything during the course of a class-action proceeding. He is free to sit it out, assured that he will be bound by the result if, but only if, the proceeding comports with the special due process requirements designed to safeguard the interests of absent class members. As the Court put it in *Shutts*, "Unlike a defendant in a normal civil suit, an absent class-action plaintiff is not required to do anything. He may sit back and allow the litigation to run its course, *content in knowing that there are safeguards provided for his protection.*" *Id.* at 810, 105 S.Ct. at 2974 (emphasis added). Those "safeguards", as enumerated in *Shutts*, are (1) "notice," (2) "an opportunity to be heard and participate in the litigation," (3) "an opportunity to remove himself from the class" by opting out, *and* (4) "adequate represent[ation]" "*at all times.*" *Id.* at 812, 105 S.Ct at 2974 (emphasis added). Thus, *Shutts* admonishes absent class members that they will be bound by the merits of a judgment—including the fairness of a court-approved settlement—if it is a product of adequate representation and their other due process safeguards. But *Shutts* promises in return that they need not monitor this proceeding from afar: if the litigation culminating in the judgment violated their due process rights, then absent class members will not be bound by it.

*Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973)—a precursor to *Shutts*—is square authority against Matsushita's intervene-or-be-estopped argument. In *Gonzales*, the Fifth Circuit rejected the very argument that Matsushita now urges upon us: "[The defendants] advance an estoppel-type argument to support the proposition that [the absent class member] cannot raise the inadequate representation issue [on collateral review]. Their position is that [the absent class member] is estopped to attack the judgment because he should have intervened." *Id.* at 76.

In rejecting this argument and holding that an absent class member may collaterally attack a judgment on the ground that he was not adequately represented, the Fifth Circuit reasoned that the question "whether counsel's conduct of the entire suit was such that due process would not be violated by giving res judicata effect to the judgment in that suit," *id.* at 74, "*necessarily requires a hindsight approach.*" *Id.* at 73 n. 11 (emphasis added). As the court went on to say, "The purpose of Rule 23 would be subverted by requiring a class member who learns of a pending suit involving a class of which he is a part to monitor that litigation to make certain that his interests are being protected...." *Id.* at 76.[8]

A hypothetical based on the facts of our case serves to illustrate the common sense soundness of *Shutts* and *Gonzales* and the impracticality of Matsushita's argument that the Epstein plaintiffs are now estopped from challenging the adequacy of representation because they failed to intervene at the fairness hearing. Suppose a class member did appear as an objector at the hearing and challenged the fairness of the settlement on the ground that it had not taken into account the claim that a $21-million payment to Sheinberg was in reality a premium for his stock. *See infra*, Section II.B.2. Suppose further that the objector produced evidence in the form of deposition testimony and documents—perhaps discovered in a parallel federal class action—casting doubt on the real purpose of the $21-million payment. Suppose still further that Delaware counsel had never heard of the $21-million payment before the objector reported it at the fairness hearing.

The question is: how should class counsel have responded to this new evidence about the Sheinberg payment during the middle of the fairness hearing, given their fiduciary duty to look after the interests of all members of the class? The obvious answer would seem to be to ask the Vice Chancellor to continue the fairness hearing until they had a

---

8. Delaware's class action provision is modeled after its federal counterpart. *Compare* Del. Chancery Court Rule 23 *with* Fed. R. Civ. Proc. 23. *See also Hoffman v. Cohen*, 538 A.2d 1096, 1098 (Del.1988) ("[T]he construction of [the Fed-eral Rules of Civil Procedure] by the federal judiciary is of great persuasive weight in the construction of the [Delaware Rules].") (citation omitted).

chance to learn more about the Sheinberg payment and consider its potential settlement value. After all, if there was evidence to prove that the $21–million payment was a premium to get Mr. Sheinberg to support the tender offer, it would take only a simple calculation to determine that other shareholders would be entitled to a substantial recovery. *See infra,* Section II.B.2.

Let us suppose, however, that for whatever reason—perhaps the irresistability of a quick fee on claims they could not litigate—counsel stuck to their guns and got the proposed settlement—2 per share (less attorneys fees)—approved and cast into a judgment. Could the law possibly be that all the class members who failed to intervene at the fairness hearing are estopped from challenging the judgment collaterally on the ground that they were not provided adequate representation? Common sense as well and *Shutts* and *Gonzales* dictate that the answer must be that they are not.

This dilemma is the driving force behind *Gonzales'* reasoning. The impracticality of assessing the adequacy of ongoing representation "live-time" is the very reason that the Fifth Circuit in *Gonzales* insisted that the challenge must be conducted with a "hindsight" approach, as on collateral review. Matsushita attempts to turn this around and limit *Gonzales'* scope to cases in which it was "impossible to raise" the constitutional claim in the original proceeding. See Appellees' Br. at 35–26 ("*Gonzales* also turns on the impossibility of participation in the original proceeding.... *Gonzales* thus stands for the limited proposition that [collateral attack is limited to] due process violations that could not have been presented in the rendering court prior to the entry of judgment.").

This is not what *Gonzales* held. On the contrary, it held that even claims that were not "impossible" to have been raised in the initial proceedings are entirely appropriate for collateral review:

To answer the question whether the class representatives adequately represented the class so that the judgment in the class suit will bind the absent members of the class requires a two-pronged inquiry: (1) did the trial court in the first suit correctly determine, initially, that the representative would adequately represent the class? and (2) Does it appear, after the termination of the suit, that the class representative adequately protected the interest of the class?

*Gonzales,* 474 F.2d at 72.

■ To hold otherwise—with respect to either prong of the inquiry—would be to require absent class members to monitor the proceedings in order to secure their rights to adequate representation. Absent class members are not required to bear this burden. *See Shutts,* 472 U.S. at 810, 105 S.Ct. at 2973–74; *Gonzales,* 474 F.2d at 76 ("The [adequate representation safeguard] would be subverted by requiring a class member ... to monitor the litigation...."). They may rest secure in the knowledge that they can attack the judgment in a subsequent action if their due process rights are in fact violated. "Due process of law would be violated for the judgment in a class action suit to be res judicata to the absent class members unless *the court applying res judicata* can conclude that the class was adequately represented in the first suit." *Gonzales,* 474 F.2d at 74 (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)) (emphasis added).[9] Indeed, to permit such a due process challenge to be definitively resolved in the initial proceeding would effectively permit an initial court to pronounce the preclusive effect of its own judgment. *See Matsushita,* —— U.S. at ——, 116 S.Ct. at 888 (Ginsburg, J., concurring in part and dissenting in part) ("A court conducting an action cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action.") (citing 7B

9. Matsushita offers yet another argument in its attempt to foreclose us from making this assessment. It claims that, because we are a *federal* tribunal, § 1738 forecloses us from reviewing the adequacy of the representation afforded absent class members in a *state* proceeding, even though another state court would be able to hear the claim. The Supreme Court has rejected this

argument. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982) ("A state may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state *and federal* courts are not required to accord full faith and credit to such a judgment.") (emphasis added) (footnote omitted).

*Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure* § 1789, at 245 (2d ed.1986)).

In adopting *Gonzales'* reasoning (and rejecting Matsushita's spin on it), we bring our circuit into line with settled law that forecloses Matsushita's intervene-or-be-estopped theory. As the Court stated in *Shutts,* "an absent class-action plaintiff is not required to do anything." *Shutts,* 472 U.S. at 810, 105 S.Ct. at 2974. Rather, it is the prerogative of absentees to remain just that: *absent* from a proceeding in which they are "parties" only virtually, through their class representatives. The "continuing solicitude for their rights" entitles absent class members to refrain from intervening, "content in knowing that there are safeguards provided for [their] protection." *Id.* at 810, 105 S.Ct. at 2974. By forcing an absent class member to monitor a proceeding and intervene to challenge the adequacy of representation that he is still in the process of receiving would defeat the purpose of having such safeguards. As Justice Ginsburg further made clear in her separate opinion in *Matsushita:* "[An absent class member] may avoid being bound *either* by appearing in the action before rendition of the judgment *or by attacking the judgment by subsequent proceedings." Matsushita,* —— U.S. at ——, 116 S.Ct. at 888 (Ginsburg, J., concurring in part and dissenting in part) (first emphasis in original, second emphasis added) (quoting Restatement (Second) of Judgments § 41, Comment a, p. 394); *see also* 18 *Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure* § 4455, at 479 (1981) ("[Adequate representation] ordinarily is ... determin[ed] in defining any class that is certified. *The question remains open to redetermination in a subsequent action,* however, since nonparties can be bound only if some party adequately represented their interests.") (emphasis added); *Gonzales,* 474 F.2d at 76 (absent class member has no duty to monitor class action proceeding); *cf. Martin v. Wilks,* 490 U.S. 755, 762–65, 109 S.Ct. 2180, 2184–86, 104 L.Ed.2d 835 (failure to intervene did not estop non-parties from suing parties to consent decree that adversely affected their interests).

2

▮ Matsushita attempts to avoid *Shutts* by arguing that *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) prevents absentees from ever collaterally challenging adequacy of representation when the forum state uses a procedure like Delaware Chancery Court Rule 23. This attempt gets Matsushita nowhere. We reiterate the fundamental principle that *Shutts* established: absent class members have a right to adequate representation "at all times," and they have no duty to intervene in the initial proceeding in order to protect that right. *Shutts,* 472 U.S. at 812, 105 S.Ct. at 2974–75. There is nothing in *Kremer* to the contrary.

In *Kremer,* the Court reaffirmed the bedrock principle that a judgment must satisfy the requirements of due process in order to receive full faith and credit. In the specific case before it, the Court held that a New York administrative proceeding was entitled to full faith and credit because the procedures it employed satisfied due process. Matsushita argues that *Kremer* likewise limits absent class members to a "procedures only" approach when they seek to challenge adequacy of representation. It points to passages in *Kremer* that ask whether the New York administrative proceeding provided the "minimum procedural requirements" of due process. *Kremer,* 456 U.S. at 481, 102 S.Ct. at 1897. It then argues that the mere existence of Rule 23 satisfies the "minimum procedural requirements" for protecting adequacy of representation. That being so, Matsushita concludes, *Kremer* never permits a collateral challenge that alleges that absent class members *in fact* received inadequate representation.

We categorically reject this simplistic application of *Kremer* to the class action context. The Court fashioned *Kremer*'s "procedures only" approach to apply to collateral challenges of judgments in traditional litigation, where individual parties are bound by virtue of their *presence* before the court. *Kremer* was not a class action and did not address the special due process problems of binding persons not parties to the action. *Shutts,* in contrast, which was a class action,

held that absentees have a right to adequate representation "at all times," 472 U.S. at 812, 105 S.Ct. at 2974, and that they need not intervene to enforce that right. No procedure can reliably protect an absent plaintiff who does not *in fact* have an adequate representative in court championing his cause. The Court recognized this salutary principle in *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), and it has never retreated from it. *See id.* at 41–42, 61 S.Ct. at 118 ("members of a class not present as parties to the litigation may be bound by the judgment where they are *in fact* adequately represented") (emphasis added).

Nonetheless, Matsushita argues, the absent class members in this case received notice, an opportunity to be heard (at the objection hearing), and the right to opt out of both the class action proceeding and the proposed settlement. Surely, Matsushita complains, these protections fully satisfied the "minimum procedural requirements" of *Kremer,* and due process does not require anything more.

The Supreme Court, however, could not have been more clear in requiring more. Indeed, if settled law defeats Matsushita's contention that absent class members have a duty to intervene or be estopped from challenging the adequacy of their representation, then this contention faces a veritable fortress of authority. In *Shutts,* the Court echoed the language of *Kremer* when it laid out the "minimum procedural due process protection" due to absent class members, including "adequate represent[ation]" "at all times." *Shutts,* 472 U.S. at 811–12, 105 S.Ct. at 2974. In addition to *Shutts,* the case law is consistent that adequate representation *in fact* is required to bind absent plaintiffs. *See Richards v. Jefferson Cty.,* —— U.S. ——, ——, 116 S.Ct. 1761, 1766, 135 L.Ed.2d 76 (1996); *Matsushita,* —— U.S. at ——, 116 S.Ct. at 885 (Ginsburg, J., concurring in part and dissenting in part); *Hansberry,* 311 U.S. at 41–43, 61 S.Ct. at 117–18; *Crawford v. Honig,* 37 F.3d 485, 487 (9th Cir.1994); *Brown v. Ticor Title Ins. Co.,* 982 F.2d 386, 390 (9th Cir.1992); *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1278 (9th Cir.1992); *In re Real Estate Title and Settlement Services Antitrust Litig.,* 869 F.2d 760, 769 (3d. Cir. 1989); *see also* Restatement (Second) of Judgments §§ 41 & 42 (1982); 18 Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 4455, at 477 (1981) ("Adequate representation [in fact] is required to support preclusion by judgment in a class action.").

None of the cases cited by Matsushita offer support for its position that absent class members who receive notice and a chance to opt out of a settlement are foreclosed from challenging adequacy of representation. Matsushita places particular reliance upon two Ninth Circuit cases—*Torrisi v. Tucson Electric Power Co.,* 8 F.3d 1370 (9th Cir. 1993), and *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173 (9th Cir.1977). Neither of these cases speak to the rights of *absent* class members, however; they involve challenges by persons who represented themselves before the court in class action proceedings.

*Torrisi* involved a direct appeal of a settlement judgment by class members who chose to participate in the trial court proceedings as objectors to the settlement, rather than resting on their *Shutts* right to be represented as absentees. *See Torrisi,* 8 F.3d at 1370, 1375 n. 2 (9th Cir.1993) (noting that litigants filed objections, opposed settlement, and "participated in the settlement hearing and argued against approval of the settlement"). Thus, *Torrisi* stands for the unremarkable proposition that class members who choose to protect their interests by intervening in the trial court proceedings—instead of relying on the representation of class counsel— are bound to the resulting judgment and may not get a second bite at the apple by attacking it collaterally. *See also Matsushita,* —— U.S. at ——, 116 S.Ct. at 888 (Ginsburg, J., concurring in part and dissenting in part) ("[T]he represented person may avoid being bound *either* by appearing in the action before rendition of judgment *or* by attacking the judgment by subsequent proceedings.").

*Torrisi* does not discuss or even allude to the rights of absent class members. Indeed, *Torrisi* does not even cite *Shutts,* the leading authority on the due process rights of absent class members. Faced with the task of explaining this omission, Matsushita attempts to distinguish *Shutts* from *Torrisi* on the

ground that *Shutts* did not involve a settlement, but rather an adjudication of a class action. Matsushita fails to cite a single case in support of its argument that *Shutts'* requirement of adequate representation "at all times," *Shutts*, 472 U.S. at 812, 105 S.Ct. at 2974, may be diluted in class settlement proceedings. Nothing in *Shutts* suggests a "sub-class" of settlement class actions in which class members are only entitled to lesser due process protections, and we see no principled basis for so limiting *Shutts*. Quite to the contrary, Matsushita's argument regarding settlement class actions was rejected by the Supreme Court in *Amchem Products v. Windsor*, —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

In *Amchem*, the Court reviewed a settlement class action certified in asbestos litigation. In the course of its analysis, the Court held that the safeguards designed for the protection of absent class members—including adequate representation—"demand undiluted, even heightened, attention in the settlement context." *Id.* at ——, 117 S.Ct. at 2248. As the Court explained, such heightened attention is necessary because a court that certifies a class for the purpose of settling claims rather than litigating them will "lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.* at ——, 117 S.Ct. at 2248. Moreover, to collapse absentees' right of adequate representation into their right to review and opt out of the settlement would be to "substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is "fair," then certification is proper." *Id.* at ——, 117 S.Ct. at 2249. "Federal courts ... lack authority" to make such a substitution. *Id. See also Prezant*, 636 A.2d at 924 (rejecting proposition that notice and opt out rights, without adequate representation, satisfy due process for settlement class actions). Matsushita's attempt to read into *Torrisi* a reduced standard of protection for absentees in settlement class actions is foreclosed by *Amchem*.

Matsushita also cites *Holiday Magic* for the proposition that notice and opt out rights may substitute for the right of absent class members to adequate representation in a settlement class action. *Holiday Magic*, however, is inapposite for the same reason as *Torrisi*: it did not involve absent class members. As did *Torrisi*, *Holiday Magic* involved an appeal of a class settlement judgment by class members who appeared in the trial proceedings—in this case, as parties to the original action. *See Holiday Magic*, 550 F.2d at 1175 ("Appellants ... filed as cross-plaintiffs [below]."). In *Holiday Magic*, our court addressed and rejected the *merits* of the appellants' claim that they had been inadequately represented. *See id.* at 1176–79. It then added—in dictum, and over the objection of then-Judge Anthony Kennedy—that it did not think that individuals who had an opportunity to opt out of the settlement after receiving notice of its terms should be allowed to "play the role of spoilers for a class of more then 31,000 people" by challenging the validity of the entire settlement on grounds of inadequate representation. *Id.* at 1177; *see also Holiday Magic*, 550 F.2d at 1179–80 (Kennedy, J., concurring) (agreeing that representation was in fact adequate but rejecting suggestion of majority that opt-out rights can substitute for adequate representation). To the extent that the panel was concerned by the prospect that an uncertified class member could forcibly bind the entire class to the result of his own claim of inadequate representation, we agree, and have held that individual objectors may not bind anyone but themselves on that issue. *See supra*, Section I.B.2.[10]

All the other cases that Matsushita cites in support of its position suffer from similar problems. Many involve *individual* litigation and do not speak at all to the rights of absent class members. *See, e.g., Kremer*, 456 U.S. at 461, 102 S.Ct. at 1886–87; *Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963); *Osborn v. Ashland Cty.*

---

**10.** In any event, *Holiday Magic* was superseded by *Shutts*, which is now the controlling authority on the rights of absent class members. To the extent that *Holiday Magic* is inconsistent with *Shutts*, we must, of course, follow the latter. *See Catli v. Catli*, 999 F.2d 1405, 1408 n. 5 (9th Cir.1993) ("Although we must ordinarily adhere to Ninth Circuit precedent, we may reexamine that precedent without the convening of an en banc panel where our precedent has been nullified by a subsequent Supreme Court decision.") (citation omitted).

*Bd. of Alcohol, Drug Addiction & Mental Health Svcs.*, 979 F.2d 1131 (6th Cir.1992). Some are like *Torrisi*—class actions in which the collateral attack was launched by class members who appeared and represented themselves in the initial action. *See, e.g., Nottingham Partners v. Trans–Lux Corp.*, 925 F.2d 29 (1st Cir.1991); *Sandler Assoc. v. BellSouth Corp.*, 818 F.Supp. 695 (D.Del. 1993), *aff'd*, 26 F.3d 123 (3d Cir.1994). And some are like *Holiday Magic*—they pre-date *Shutts*, the controlling authority on the due process rights of absent class members. *See, e.g., Laskey v. UAW*, 638 F.2d 954 (6th Cir. 1981). None speaks authoritatively to the rights of absent class members who claim inadequate representation by their class fiduciaries.

In sum, neither caselaw nor common sense supports Matsushita's position that the mere existence of procedures like Rule 23 can foreclose an absentee from receiving his day in court on the issue of adequacy of representation. Rather, the established practice of our circuit is exemplified by *Brown v. Ticor Title.* In that case, we entertained the merits of a collateral challenge by absent class members to adequacy of representation, stating unequivocally that "if the plaintiff was not adequately represented in the prior action or there was a denial of due process, then the prior decision has no preclusive effect." *Brown v. Ticor Title Ins. Co.* at 390 (citing *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). Matsushita simply cannot overcome the settled law that absent class members need not do anything during the course of the proceeding, "content in knowing that there are safeguards provided for [their] protection," including the requirement that they be "adequately represented" "at all times." *Shutts*, 472 U.S. at 811–12, 105 S.Ct. at 2974–75.

## II

We now turn to the merits of the adequacy of representation issue. Following the model provided by *Gonzales*, we conduct a "two-pronged inquiry," *Gonzales*, 474 F.2d at 72.[11] First, we determine whether there was a disabling conflict of interest between Delaware counsel and the MCA shareholders who tendered their shares. Second, we review the actual conduct of Delaware counsel in discharging their fiduciary duty to protect the interests of those shareholders. *See id.* at 72–77.

### A

■ The essence of the Epstein plaintiffs' position on the claimed conflict of interest is that the Delaware settlement was the product of a one-sided bargaining process because their representatives went to the table with no credible bargaining power. Not surprisingly, Matsushita makes no serious attempt to challenge this position, relying almost exclusively on their arguments as to why we cannot reach the merits. *See* Appellees' Br. at 41–44. It is axiomatic that a plaintiff's power to negotiate a reasonable settlement derives from the threat of going to trial with a credible chance of winning. As the Supreme Court has said, permitting class-action settlements in which class counsel are disabled from litigating the case renders:

> both class counsel and court ... disarmed. Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, see Coffee, Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L.Rev. 1343, 1379–1380 (1995), and the court would have to face a bargain proffered for its approval without the benefit of adversarial investigation, see, *e.g., Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (C.A.7 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) (parties "may even put one over on the court, in a staged performance"), cert. denied, 520 U.S. ——, 117 S.Ct.[sic] 1569, 137 L.Ed.2d 714 (1997).

*Amchem*, —— U.S. at ———–——, 117 S.Ct. at 2248–49 (1997) (per Ginsburg, J.); *see also Kamilewicz*, 100 F.3d at 1352 (Easterbrook,

---

11. In *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir.1992), our Circuit adopted *Gonzales'* model for conducting an analysis of adequacy of representation (although distinguishing *Gonzales'* result), with one additional requirement. We held that, on collateral attack, "a party must show ... that the opposing party was on notice of facts making [the alleged inadequacy of the representation] apparent." *Id.* at 390–91. In this case, that requirement is easily met, as Matsushita was on notice of all the information in the record on which we base our analysis.

J., joined by Posner, C.J., and Manion, Rovner, and Diane P. Wood, JJ., dissenting from denial of rehearing en banc) ("The lawyers support the settlement to get fees; the defendants support it to evade liability; the court can't vindicate the class's rights because the friendly presentation means that it lacks essential information.").''

The Delaware class plaintiffs and their counsel could not carry out a threat to litigate the federal claims in this case, and Matsushita knew it.

The inability of the class representatives to exercise any leverage on behalf of the Epstein plaintiffs was the result of three basic facts. First, they could not litigate the federal claims because Congress has said that Exchange Act claims may not be litigated in state courts. Thus, the claims that Matsushita violated SEC Rule 14d–10 by paying premiums to Messrs. Wasserman and Sheinberg were not and could not have been pleaded in the Delaware action. Moreover, there was no discovery on those claims; indeed, the Delaware plaintiffs probably were *unable* to conduct any discovery on the federal claims because the facts relevant to those claims had no apparent relevance to the subject matter of the state law claim that the MCA directors had breached their fiduciary duties in failing to maximize shareholder value upon a change of corporate control. *See Epstein I,* 50 F.3d at 659; Del. Chancery Court Rule 26(b)(1). Finally, Matsushita would have had reason to discount the value of any settlement made with the state plaintiffs against the risk that a state court judgment releasing Exchange Act claims would not survive a collateral attack on the ground that the Delaware courts had no jurisdiction to release exclusively federal claims especially in light of the absence of any overlapping issues of fact between the state and federal claims. *See Epstein I,* 50 F.3d at 662–65.[12] Matsushita must have recognized that it would subject itself to a substantial risk by settling the federal claims in state court rather than federal court, and would have had to discount its bottom line in the state settlement negotiations accordingly. The denouement was predictable: Matsushita used its infinitely superior bargaining power vis-a-vis the state class representatives to settle the Exchange Act claims at a rock bottom price.[13]

Second, the class representatives not only lacked the bargaining power that comes with a credible threat of going to trial and winning, they also lacked the ability to make a credible threat that they could put Matsushita at risk by going to trial on the state claims and proving facts material to the federal claims that would be binding upon Matsushita through issue preclusion. Because the state and federal claims shared no common issues of material fact, a judgment on the state claims could not be used as an "offensive" estoppel in future litigation of the federal claims. *See Epstein I,* 50 F.3d at 665–55. While the Delaware class representatives lacked the muscle to put Matsushita at risk on the federal claims, the existence of their state class action, however worthless standing alone, served to provide Matsushita with an opportunity to try to get rid of the federal claims at a bargain basement price. If the parties could get court approval of a settlement that released the federal claims, Matsushita would have at least a fair shot of using the judgment to block the federal action with a full faith and credit argument.

---

12. We note that this additional factor, though instructive in giving a full picture of the relative bargaining strength of the parties in this case, is not necessary to our holding that Delaware counsel's representation of the Epstein plaintiffs was inadequate.

13. Indeed, it would not be an exaggeration to say that the Delaware plaintiffs were kept in state court entirely at the sufferance of Matsushita. As we discuss below, the Delaware Vice Chancellor, in rejecting the first settlement, determined that the state law claims were "extremely weak" and had "little or no value" because no such state cause of action existed. *See In re MCA Shareholders Litigation,* 598 A.2d 687, 694 (Del. Ch.1991); *infra,* Section II.B.2. Matsushita could have, but did not move the Chancery Court to dismiss the state action. Rather, it chose to use it as a vehicle for seeking an inexpensive release of the federal claims. *See also* 18 *Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure* § 4470, at 526 (Supp.1997) ("In approving the settlement, the Delaware Vice Chancellor observed that the defendants seemed more bent on escaping potential liability under federal law than on avoiding state-law claims that the Vice Chancellor had earlier characterized as extremely weak.").

That is, of course, exactly what Matsushita did as soon as the judgment became final. We had the Epstein plaintiffs' appeal of the district court's summary judgment under submission when Matsushita notified us of the Delaware settlement judgment and argued that we should give it preclusive effect.

Third, Matsushita had a further bargaining advantage, quite apart from its knowledge that the Delaware plaintiffs could not put it at risk on the federal claims. Matsushita also knew that class counsel had an extraordinary incentive to settle and settle *quickly* because that was the *only* way they could extract a fee out of the federal claims. Class counsel could not benefit from the federal claims by going to trial for the obvious reason that the federal claims could not be litigated in state court. Moreover, the pendency of a parallel action in federal court— the *Epstein* case—meant that Delaware class counsel were at risk of being "beaten to the punch" and getting no return on the federal claims at all. Matsushita knew that it was negotiating a release of the federal claims with class counsel who could not litigate those claims and whose self-interest gave them an incentive to settle and settle fast.

What all this demonstrates is that there was a jarring misalignment of interests between class counsel and members of the federal class. It was plainly in the best interest of counsel to settle the federal claims at any price. For them, any settlement was better than no settlement because settlement was the only way they could make any money on the federal claims—indeed, given that the state claims were essentially worthless, it was the only way that Delaware counsel could get any compensation at all. Delaware counsel were not, after all, serving as *pro bono* counsel to the MCA shareholders who tendered their shares.

It was not, in contrast, in the best interest of the clients—the MCA shareholders—to settle their Exchange Act claims at any price. Their interest lay in settling those claims for a sufficient amount to make it imprudent to take the risk of litigation. That risk, of course, would have to be realistically assessed in terms of the chances of prevailing on either or both of their claims that Matsushita had violated SEC Rules 10b–13 and 14d–10 in paying premiums to Messrs.

Wasserman and Sheinberg. Indeed, the misalignment of interests and incentives between class counsel and their clients in these extraordinary circumstances was so great that it is fair to say that counsel's interests were more in line with the interests of Matsushita than those of their clients.

■ This was not the adequate representation of absent class members that due process requires "at all times." *Shutts*, 472 U.S. at 812, 105 S.ct. at 2974. As we have said, "An adequate representative must ... be free from economic interests that are antagonistic to the interests of the class." *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir.1990). The interests of Delaware counsel in this case were nothing but antagonistic to the interests of the MCA shareholders who tendered their shares. As a result of the three factors described above, which make this case extraordinary on its facts, Delaware counsel's overriding economic interest lay in settling the federal claims at any price and winning the race to judgment. The interests of the MCA shareholders who tendered their shares, in contrast, lay in pursuing those claims vigorously and either obtaining a reasonable settlement or litigating the claims in federal court. Their interests certainly did not lie in agreeing to a settlement that gave the attorneys a $1,000,000 fee but nothing for themselves—the settlement originally proposed by Delaware counsel—nor in agreeing to a settlement of 2 per share, inclusive of attorneys' fees—the settlement Delaware counsel ultimately persuaded the Vice Chancellor to approve. The inability of Delaware counsel to litigate the federal claims, their further inability even to obtain a judgment on the state law claims that could have had issue preclusive effect on the federal claims, and the pendency of a competing parallel class action in federal court caused the economic interests of Delaware counsel to be fundamentally "antagonistic to the interests" of the Epstein plaintiffs. *Id.* As we have previously said—and as pure common sense dictates—"Adequate representation ... depends on ... an absence of antagonism." *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir.1992). Here, there is no question that there was antagonism between the interests of the lawyers and the interests of

their clients. That antagonism made their representation of the MCA shareholders who tendered their shares inadequate as a matter of law.

### B

In addition to the argument that Delaware counsel had a disabling conflict of interest, the Epstein plaintiffs contend that the actual conduct of Delaware counsel in settling the federal claims fell far short of the representation that due process requires. Rather, they claim, Delaware counsel completely failed to investigate or develop their federal claims and basically "rolled over" during settlement negotiations, ultimately entering into a settlement that was essentially worthless except for their own fees. This course of conduct, they conclude, falls well below the level of representation that is required to bind absentees. We agree.

Adequate representation requires that counsel "vigorously and tenaciously protect[ ] the interests of the class." *Gonzales,* 474 F.2d at 75. "Vigorous" and "tenacious" protection requires, at a minimum, that counsel pursue their clients' claims, make a reasonable effort to assess the fair settlement value of those claims, and pursue a settlement that approximates that value, always taking into account the ever-present risks of litigation. The inadequacy of Delaware counsel's representation is brought into sharp focus by their vigorous *disparagement* of the federal claims throughout the course of the settlement proceedings. Indeed, Delaware counsel's representation of those claims surpassed inadequacy and sank to the level of subversion. Counsel consistently sought to convince, not only their clients, but their adversaries and the Chancery Court itself that the federal claims had no merit. They repeatedly and summarily dismissed those claims as "frivolous" without ever conducting any discovery or any meaningful analysis of the legal issues, much less presenting the claims in a favorable light. *See* SR 171–72. In sharp contrast, the Epstein counsel earnestly pursued those same claims in federal court, recognizing their merit and successfully demonstrating that merit in persuading

this court to reverse an adverse summary judgment ruling below. This contrast makes it all the more clear that Delaware counsel's representation of the MCA shareholders who tendered their shares fails even the most minimal standards of adequacy.

### 1

Barely fifteen days after the Epstein counsel filed a class action in federal court on the exclusively federal claims, Delaware counsel negotiated the release of those claims. This first Delaware settlement proposed to release all claims, state and federal, arising out of the Matsushita–MCA merger, in exchange for $1 million *in attorney fees, no* monetary compensation for shareholders, and an amended poison pill provision of dubious value. *See Epstein I,* 50 F.3d at 660; SR 75–76. In its notice to the class members regarding this settlement, Delaware counsel explained that the plaintiffs in the federal action alleged that Matsushita had violated SEC Rule 14d–10 by offering Wasserman different and more valuable consideration for his shares than it offered to other tendering shareholders.[14] In recommending the settlement of those claims, counsel told their clients that "the substantial benefits the plaintiffs and the other members of the Class can expect to receive by virtue of the Settlement" outweighed "the risks, burdens and costs of continued litigation . . . [and the] uncertainties relating to proof of the allegations contained in the various actions." SR 76. Counsel put no flesh on this bare-bones analysis. In particular, they never explained why litigation of the state law claims would put the federal claims at "risk." Moreover, the notice for the settlement hearing offered no defense of the proposition that the benefits of the settlement were "substantial" in relation to the value of the federal claims it released. Rather, the notice merely assured class members that counsel had conducted "extensive investigation of the facts and examination of the law involved," SR 76, and had concluded that the settlement was fair. It is hard to imagine what Delaware counsel meant by an "extensive investigation," since

---

**14.** At the time of the hearing on the first settlement proposal, the Epstein plaintiffs had not yet pled the Sheinberg claim. They did so some

time after the Vice Chancellor rejected the first proposed settlement.

the record shows no discovery at all on the facts underlying the federal claims. Indeed, this lack of discovery is hardly surprising. As discussed above, Delaware counsel were probably disabled from developing the federal claims through traditional discovery, since discovery in state court was limited to matters relevant to the subject matter of the state claims—that the MCA directors had violated their fiduciary duty to attempt to secure a better deal than the one Matsushita offered the shareholders. *See* Del. Chancery Court Rule 26(b)(1); *supra*, Section II.A.

Indeed, the record is clear that Delaware counsel had not conducted an extensive investigation into the merits of the federal claims in order to determine their fair settlement value. Delaware counsel admitted to the Chancery Court that they had reviewed the Wasserman claim "relatively quickly" before concluding that the claim was "frivolous" and would be "a waste of our time." SR 171–72. In fact, in their cursory review, Delaware counsel simply adopted two of the defenses raised by *Matsushita* in federal court. First, Delaware counsel took Matsushita's position that claims under Rule 14d–10 should be limited to actions taken within a rigidly defined "tender offer period." SR 123–28; *see also Epstein I,* 50 F.3d at 653–54. Matsushita had claimed that this "pure timing" rule allowed it to give additional consideration to Wasserman by timing the exchange of his stock to occur immediately after Matsushita's acceptance for payment of all other shares tendered. *See Epstein I,* 50 F.3d at 653. Delaware counsel accepted Matsushita's "pure timing" rule uncritically and used it to disparage the Wasserman claim. SR 123–28.

Second, Delaware counsel agreed with Matsushita's position that the Wasserman agreement did not violate Rule 14d–10 because Wasserman actually received "substantially less than the cash consideration received by MCA's other stockholders." SR 129. Once again, the record shows no dis-covery activity at all. Instead, Delaware counsel simply accepted at face value Matsushita's position that "the Wasserman deal was less valuable than that provided to the other shareholders in the form of cash." SR 185. Epstein counsel, in contrast, produced evidence and expert testimony in arguing that Wasserman's deal was structured in order to confer upon him considerable tax benefits, and that the after-tax value that Wasserman would receive was actually much greater than the value of the tender offer to the average shareholder. *See Epstein I* Appellants' Br. at 15–16, 55.

Despite the best efforts of Delaware counsel to disparage the Exchange Act claims of the absentees they were "representing," the Chancery Court rejected the first settlement because the Wasserman claim had "significant value" while the state law claims had "little or no merit." *In re MCA Shareholders Litig.,* 598 A.2d at 690. On the merits of the federal claim, the Chancery Court was far from convinced that Delaware counsel's pure timing rule controlled: "This issue has not yet been definitively addressed by the courts and therefore this [Rule 10b–13] claim ... clearly has arguable merit." *Id.* at 695.[15] In addition, the Chancery Court refused to accept Delaware counsel's uncritical account of the value of Wasserman's deal: "Although it is claimed that the value of the consideration given to Wasserman had less value than the cash offered to the other stockholders, the true economic value of the Wasserman consideration is uncertain." *Id.* at 695.[16] In light of the "substantial merit" of the Wasserman claim, the court held that it would be unfair to release all federal claims in a settlement that offers "no real monetary benefit to the Class" but awards the attorneys $1 million in fees. *Id.* at 695–96. The court dismissed the value of the revised poison pill provision as "illusionary [sic]." *Id.* at 696.

**15.** Matsushita offered no authority and not much reasoning in support of this hypertechnical rule, while we offered reasons and contrary authority for rejecting it in a five page analysis. *See Epstein I,* 50 F.3d at 653–57.

**16.** In the summary judgment proceedings in federal district court, Matsushita did not controvert the allegation in the Epstein plaintiffs' complaint that Wasserman's consideration had a greater per share value than that received by other shareholders. The Epstein plaintiffs produced evidence on this issue, *see Epstein I,* 50 F.3d at 657 n. 9, and we left the issue open for redetermination on remand, *see id.* at 657.

2

The record of the Delaware action shows no activity for the ten months following April 25, 1991. The case lay dormant until the district court in Los Angeles entered summary judgment on February 10, 1992.[17] *See* SR 625. During the same interval, Epstein counsel were vigorously pursuing the federal claims, as demonstrated by over ten pages of docket entries in district court. *See* SR 803–13. Eight months later, Delaware counsel agreed to settle the exclusively federal claims for the sum of $2 million—a bare 2 a share, *inclusive* of attorney fees. *See* SR 352, 356. In advocating the second settlement to the class and the Vice Chancellor, Delaware counsel continued to disparage the federal claims. They rested their disparagement primarily on the position that the district court's entry of summary judgment was "dispositive as to [the federal claims'] lack of substantial merit." SR 460. They failed to point out, however, that the Ninth Circuit affords no deference to a district court's decision on summary judgment, but reviews such determinations *de novo. See, e.g., Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). Nor did Delaware counsel make any effort to assess the likelihood of reversal by the Ninth Circuit. They merely reiterated *Matsushita 's* arguments in an effort to convince the Chancery Court once again that the federal claims were worthless. In fact, *Delaware counsel specifically urged the Chancery Court "not [to] delve into the ultimate merits of [the federal] claims upon appeal as if it were reviewing de novo the dismissal,"* but instead that it treat the district court's decision as "dispositive." SR 460.

Delaware counsel argued without explanation that it was "doubtful" that the Ninth Circuit would reverse the district court to hold either that there is a private right of action under Rules 10b–13 and Rule 14d–10, or to reject Matsushita's strict timing rule. SR 461–64. They urged the Chancery Court to give the dismissal of the federal claims "presumptive effect." SR 553. Counsel claimed to have "reviewed the law and ... reviewed the briefs and ... looked at the findings of fact" [18] in the federal action before determining that the federal claims were "so fraught with uncertainty, that those claims are so weak, that the record in that proceedings ... is so horrendous, that the prospect of anything emerging from that case is so remote, that $2 million more than adequately compensates—much more than adequately compensates for the release of all the federal and state claims." SR 555–56.[19] Without citing any caselaw regarding private rights of action under Rule 10b–13 or Rule 14d–10, Delaware counsel reasoned that, as a general matter, the Supreme Court and the Ninth Circuit had drastically narrowed the bases upon which private rights will be implied under any statute. *See* SR 461. Based on these generalizations and their reading of Rule 10b–13 and the implementing statute of Rule 14d–10, counsel concluded that the "weight of authority" suggested that neither Rule 10b–13 nor Rule 14d–10 authorizes a

17. Matsushita also exhibited a curious degree of inaction during this period. Specifically, following the Chancery Court's determination that the state claims had "little or no merit," *In re MCA,* 598 A.2d at 690, Matsushita did not take the action that would seem to have been most advisable and move the Chancery Court to dismiss the claim. While we do not rest our holding in this case on any finding that there was collusion between Matsushita and Delaware counsel, we note the Chancery Court's comment that "suspicions abound." *In re MCA Shareholders Litigation,* 1993 WL 43024 (Del.Ch.) (Feb.16, 1993), at *5.

18. A district court does not, of course, make "findings of fact" in ruling on a summary judgment motion. Findings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations, which explains why they are reviewed deferentially under the clearly

erroneous standard. *See* Fed. R. Civ. Proc. 52(a). As we have said, summary judgments are reviewed *de novo* by the Ninth Circuit.

19. Similarly, in their notice to the class members, Delaware counsel used the same boilerplate language found in the first notice of settlement, claiming that they had conducted "extensive investigation of the facts and examination of applicable law," and that they recommended settlement "after considering (i) the substantial monetary benefits that [class members] will receive pursuant to the Settlement; ... [and] (iii) the attendant risks and delays of continued litigation." SR 353. Once again, counsel did not identify the "risks" involved in litigating the state law claims, nor did they explain why the benefits of settlement were "substantial," especially in relation to the value of the federal claims. *See supra,* Section II.B.1.

private right, SR 461–62, and characterized the federal claims as "lacking in substantial merit." SR 546.

Counsel's "analysis," however, disregarded two cases, from the Second and Third Circuits, that are square holdings that there is a private right of action under Rule 14d–10. *See Polaroid Corp. v. Disney*, 862 F.2d 987, 991, 997 (3d Cir.1988); *Field v. Trump*, 850 F.2d 938, 946 (2d Cir.1988). Counsel's failure to report these cases to class members and to the Vice Chancellor is even more astonishing given that they actually cited *Field* on the issue of the timing of the Wasserman transaction. For counsel not to cite *Field* on the private right of action issue, or to cite *Polaroid* at all, is inexcusable. Needless to say, Epstein counsel cited these cases to us on appeal, *see Epstein I* Appellants' Br. at 52–55, and we followed them and brought the Ninth Circuit into line with the Second and Third Circuits, finding that a private right of action does exist under Rule 14d–10. *See Epstein I*, 50 F.3d at 652.

Delaware counsel also stated without explanation that the Ninth Circuit was "unlikely" to overturn the district court's holding that the Wasserman transaction took place after the expiration of the tender offer period, or that Wasserman did not receive greater consideration for his shares than the other MCA shareholders received. *See* SR 464–67. Once again, counsel declined to mention that we would review the district court's summary judgment rulings *de novo*. As it did in the first settlement proceedings, counsel accepted without question Matsushita's self-serving valuation of the Wasserman deal, stating in a conclusory fashion that the "lack of negotiability and relative risk" of Wasserman's preferred stock "more than sufficiently outweigh whatever tax benefits Wasserman may have derived." SR 467. Without discussing whether the value of the Wasserman consideration might present a genuine issue of fact, counsel simply stated that the district court's decision regarding the timing and value of the Wasserman transaction "would seem most unlikely to be overturned on appeal." SR 465.

Finally, to cap off their disparagement of their clients' Exchange Act claims, Delaware counsel asserted generally that the federal claims should not stand in the way of settlement because "damages on the federal claims are highly uncertain." SR 468. Counsel simply ignored the obvious: that damages on the Sheinberg claim, at least, were both easily calculable and uncontested. Matsushita paid Sheinberg $21 million in addition to the $66 in cash per share of MCA stock that it paid other shareholders. When divided by the number of shares that Sheinberg tendered, this $21–million payment would equal a premium of $17.80 per share. *See Epstein I*, 50 F.3d at 657. Thus, a simple calculation of $17.80 multiplied by the total number of shares outstanding—approximated as 78,-000,000, *see* SR 556, 568–69—would yield damages of about $1.4 billion on a successful Sheinberg claim. Even so, counsel stuck to its strategy of disparaging the federal claims in their effort to get the Vice Chancellor to approve the settlement that would produce them a fee.

In fact, there is not a single mention of the $21 million-payment to Sheinberg in Delaware counsel's memoranda or arguments to the Chancery Court. *See* SR 458–70; SR 538–63; 591–99. In their representations to the court concerning the pending federal action, Delaware counsel stated only that the federal complaint "alleg[ed] that the arrangement whereby defendant Wasserman exchanged his MCA stock for preferred stock in the merged entity (1) violated SEC Rule 10b–13 ... and (2) violated SEC Rule 14d–10." SR 439–40. They did not even mention the claim on the $21 million payment that had been pleaded in the Epstein plaintiffs' amended complaint.

It is clear, however, that Delaware counsel was aware of the Sheinberg claim. Counsel described that claim, if only briefly, in their notice to the class members as "a payment to defendant Sheinberg, which defendants asserted was ... incentive compensation," SR 346, but which plaintiffs alleged was a "covert premium ... designed to induce Sheinberg to tender his shares." *Epstein I*, 50 F.3d at 657. In contrast, Epstein counsel learned about the $21 million payment and investigated it, questioning both Wasserman and Sheinberg about it at their depositions. *See Epstein I* ER 357, Ex. V:51–53 (deposition of Wasserman), Ex. W:193–95 (deposi-

tion of Sheinberg). Their answers revealed that no MCA board documents prior to the date of the tender offer referred to any such payment to Sheinberg. *See id.*[20] Epstein counsel relied in part on this evidence to argue the existence of a genuine issue of material fact and convince this court to reverse the summary judgment on this claim. *See Epstein I,* 50 F.3d at 658; *Epstein I* Appellants Br. at 32 (citing Wasserman and Sheinberg depositions conducted by Delaware counsel). Yet, despite the $17.80 per share value of the Sheinberg claim if a trier of fact were to find that the $21 million was a premium paid to induce Sheinberg to support the tender offer and not incentive compensation for past services, Delaware counsel stood mute on the claim while urging the Vice Chancellor to approve the settlement of $2 million, or 2 per share, inclusive of attorneys fees. Once again, the conduct of Delaware counsel in the performance of their fiduciary duties was inexcusable.

In sum, the only "vigorous" and "tenacious" work, *Gonzales,* 474 F.2d at 75, that Delaware counsel performed on behalf of the Epstein plaintiffs was to convince the Chancery Court to adopt their adversary's position and view the federal claims as essentially worthless. This was not merely "inadequate" representation, it was hostile representation that served the interests of counsel in getting a fee, but did not serve the interests of the MCA shareholders in getting a settlement based upon a thorough and fair assessment of their Exchange Act claims. To bind the Epstein plaintiffs to the Delaware judgment under these circumstances would violate their due process right to have their interests adequately represented at all times.

### III

The Epstein plaintiffs also contend that we may withhold full faith and credit from the Delaware judgment because the Vice Chancellor did not adequately supervise the settlement proceedings. They argue that adequa-

cy of judicial supervision is intricately bound up with adequacy of representation and, hence, that it rises to the level of a due process requirement. *See* Appellants' Br. at 31–37. In effect, they argue that we should add adequacy of judicial supervision to the four safeguards that *Shutts* guarantees to absent class members.

The Epstein plaintiffs cite no authority for their argument, however. They merely point us to various cases, including *Epstein I,* that have spoken in general terms about the importance of the court's role in supervising a class action proceeding. *See Epstein I,* 50 F.3d at 667; *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litigation,* 55 F.3d 768, 805 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) (describing "fiduciary responsibility" of courts in class actions); *Prezant,* 636 A.2d at 921 (stressing "fiduciary nature of the class action"). Because we hold that the absent class members were denied due process because of inadequate representation, we need not reach this novel constitutional question.

### CONCLUSION

Our decision that the Delaware judgment deprived the Epstein plaintiffs of their due process rights to adequate representation is the product of an extraordinary set of circumstances. Delaware counsel suffered from a conflict of interest: they could not litigate the Exchange Act claims of the absent class members, could not extinguish those claims by the issue preclusive effect of a judgment based upon the state claims, and were in competition with a parallel class action in federal court which threatened to destroy their chances of securing a fee. Not surprisingly, their conduct in the Delaware action reflected this disabling conflict. Delaware counsel disparaged the Exchange Act claims of their own clients at every turn—to the

---

**20.** Matsushita and MCA have contended that Sheinberg was entitled to incentive compensation for past services in the form of stock options, but the Epstein plaintiffs discovered that the minutes of MCA's board meetings contained no reference to any such stock options to Sheinberg prior to the time Matsushita made its tender

offer. The evidence that does exist shows the payment to Sheinberg was to be made two days after Matsushita accepted the MCA shares for payment and that Matsushita approved the agreement to make the payment. *See Epstein I,* 50 F.3d at 657–59.

clients themselves, to their adversaries, and even to the Chancery Court.

These extraordinary circumstances provide a sufficient answer to Matsushita's concern that our decision will pose a grave threat to the finality of class action judgments. The reality of the matter is that it is the rare exception for representation in a class action even to approach the point where an absentee will have a colorable claim for inadequacy. The small handful of cases that have come to our attention in which absentees have successfully challenged adequacy of representation bears this observation out. The paucity of such cases is to be expected. With rare exceptions, trial judges do their jobs and certify class representatives capable of representing the interests of absent class members. And, again with rare exceptions, the class representatives (including their counsel) faithfully discharge their fiduciary duties to the class. This case presents one of those rare exceptions.

We REVERSE the judgment and REMAND for proceedings consistent with Parts I, II, III, V & VI of *Epstein I.*

O'SCANNLAIN, Circuit Judge, dissenting:

Because I wholeheartedly agree with the Supreme Court's determination that the adequacy of representation issue was fully and fairly litigated and necessarily decided in the Delaware courts, I must respectfully dissent from the opinion this court announces today. In fashioning its own version of the events as they unfolded before the Delaware courts, the majority posits that the plaintiffs' adequacy claims were neither "actually litigated" before the Chancery Court nor "finally decided" by that court. With all deference, I believe that the undisputed facts tell a different story.

I

The argument urged upon us by the Epstein plaintiffs certainly engenders sympathy and has some force. Irrespective of whether the Delaware attorneys' conduct in the state court rose to the level of constitutional deprivation, their act of referring, in a single breath, to their own clients' claims as "fraught with uncertainty," "weak," and "horrendous" suggests less than dynamic advoca-cy. Regrettably, however, and unlike my colleagues, I do not believe that we are in a position to pass judgment on the merits of this appeal. The very issue presented to our court for decision today—whether or not the Epstein plaintiffs received constitutionally adequate representation in the Delaware courts—has been fully and fairly litigated before a state court of competent jurisdiction and finally decided by that court. Consequently, under the Full Faith and Credit Act, 28 U.S.C. § 1738, and the policies of federalism, comity, and finality that give it life, our court is not, in my mind, free simply to revisit the issue.

I do agree with my colleagues that the Supreme Court did not conclusively resolve the due process issue before it remanded the case to us. Indeed, as our court's opinion points out, the Supreme Court specifically disclaimed any interest in resolving the merits of the inadequacy claim. *See Matsushita Elec. Indus. Co. v. Epstein,* —— U.S. ——, —— n. 5, 116 S.Ct. 873, 880 n. 5, 134 L.Ed.2d 6 (1996). However, the fact that the Supreme Court chose *not* to reach the due process challenge does not inexorably lead to the conclusion that this court *may* decide the issue. Quite the contrary, after reviewing the record, the Supreme Court concluded—in three separate passages and in no uncertain terms—that the Delaware courts had *already* conclusively resolved the due process issue. First, in Part I, in which it described the procedural posture of the case, the Court stated, rather matter-of-factly, that "[a]fter argument from several objectors, *the [Chancery] Court found the class representation adequate . . . .*" *Id.* at ——, 116 S.Ct. at 876 (emphasis added). Several pages later, the Court reiterated its conclusion: citing the decisions of the Delaware courts approving the second MCA settlement, the Supreme Court specifically found that the Chancery Court, in accordance with Delaware Court of Chancery Rule 23, had "*determined* that the plaintiffs[,] . . . as representatives of the Settlement Class, have fairly and adequately protected the interests of the Settlement Class." *Id.* at ——, 116 S.Ct. at 880 (quoting Order and Final Judgment at 2, *In re MCA, Inc. Shareholders Litig.,* C.A. No. 11740, 1993 WL 43024 (Del.Ch. Feb. 22, 1993)) (in-

ternal quotation marks omitted) (emphasis added). Finally, in its now famous footnote five, the Court expressed its skepticism at plaintiffs' decision even to press the due process issue *"in spite of the Chancery Court's express ruling,* following argument on the issue, that the class representatives fairly and adequately protected the interests of the class." *Id.* at —— n. 5, 116 S.Ct. at 880 n. 5 (emphasis added).

Consequently, it is scarcely debatable that in the eyes of the Supreme Court, the Epstein plaintiffs' due process challenge was presented to and rejected by the Delaware state courts. The trouble, I suppose, is that the majority and the Supreme Court do not share the same vision.

## A

In support of its "no-actual-litigation" argument, the majority first complains that, despite the fact that the form of notice sent to class members explicitly provided the rights to opt out and to object,[1] that notice "said nothing about adequacy of representation." Maj. Op. at 1240. Of course, the first, most obvious, and most decisive response to the majority's complaint is that the doctrine of collateral estoppel simply does not demand that an issue be actually *noticed for* argument, only that it be actually *litigated at* argument. *See, e.g., Messick v. Star Enter.,* 655 A.2d 1209, 1211 (Del.1995) ("The test for applying collateral estoppel requires that (1) a question of fact essential to the judgment, (2) be litigated and (3) determined (4) by a valid and final judgment." (quoting *Taylor v. State,* 402 A.2d 373, 375 (Del.1979))). Secondly, even if lack of notice were somehow independently relevant to a proper collateral estoppel analysis, the court's no-notice argument fails to account for the fact that the form of notice mailed to each of the class members detailed the precise terms of the settlement. The very terms of that settlement—so pungently characterized by the majority as "a bare 2 a share, *inclusive* of

attorney fees" and a release of all claims, state and federal—are *prima facie* evidence that something was amiss. *See* Maj. Op. at 1252–53. That fact—that the settlement *on its face* raises eyebrows—was no less true on October 27, 1992, when the notice was mailed, than our court finds it today. Consequently, the Epstein plaintiffs "were not forced into a position of having to predict whether their interests would be adequately represented. They could determine whether there had been adequate representation of their interests by reviewing the terms of the settlement." *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1177 (9th Cir.1977); *accord In re Four Seasons Sec. Laws Litig.,* 502 F.2d 834, 843 (10th Cir.1974). They knew that they could object in the Delaware courts to the settlement, and, by implication, to the representation that had produced the settlement; they simply declined to do so.[2]

Closer to the heart of the appropriate collateral estoppel standard, the court claims—inexplicably, in my view—that the objectors who did elect to appear at the settlement hearing did not "actually litigate" the adequacy of their representation. To the contrary, one of the objectors, William Krupman, explicitly stated (as the majority itself acknowledges) that he opposed the settlement because "the purported class representatives ... had proposed a settlement that benefitted no one but their own attorneys. *They did not provide adequate representation to the class."* Affidavit of William A. Krupman at 2—3, *In re MCA, Inc. Shareholders Litig.,* Civ. A. No. 11740, 1993 WL 43024 (Del.Ch. Feb. 16, 1993) (emphasis added). The majority attempts to cushion the blow of Mr. Krupman's explicit statement by accusing it of "conflating the non-constitutional question of the fairness of the settlement with the constitutional question of the adequacy of representation." Maj. Op. at 1241. Its criticism, however, rings particularly hollow for one salient reason, alluded to

---

1. A number of the class plaintiffs exercised their procedural rights pursuant to the notice: eighteen shareholders opted out of the class, and three class members appeared in the Delaware Chancery Court to object to the settlement. *See In re MCA, Inc. Shareholders Litig.,* Civ. A. No. 11740, 1993 WL 43204, at \*3 (Del. Ch. Feb. 16, 1993).

2. I might add that the Epstein plaintiffs' counsel's candid admission to the Supreme Court that his clients stayed out of the Delaware proceedings for purely strategic reasons, *see infra* page 1259–60, is conclusive proof that any perceived notice failure was illusory.

briefly above: the court's *own* conclusion of inadequacy rests substantially on precisely the same logic, namely, that, *under the terms of the settlement,* the Delaware plaintiffs' attorneys who profited so well did so at the expense of their class-member clients. *See generally* Maj. Op. at 1250–55.

The majority dismisses the arguments of another of the objectors, Pamela Minton de Ruiz, out of hand because she failed to use the magic word "inadequacy." Rather, the court notes, Minton de Ruiz "framed her objection in terms of *collusion.*" Maj. Op. at 1240 (emphasis added). The court simply brushes Minton de Ruiz's objection aside because, it complains, she did not "focus[ ] on the much broader issue of whether representation was constitutionally adequate." Maj. Op. at 1240. Formalistic labels and logic games [3] aside, however, it appears that the court has either failed to recognize *for* itself or failed to admit *to* itself that the Epstein plaintiffs bottom their inadequacy of representation argument on virtually the identical factual predicate upon which Minton de Ruiz based her "collusion" objection. For instance, the Delaware Chancery Court characterized Minton de Ruiz's argument in the following terms:

> She argues ... that the Delaware plaintiffs have colluded with the defendants to settle this action and dispose of the supposedly meritorious federal claims in exchange for an award of attorneys' fees and a de minimis benefit to the class.

*In re MCA, Inc. Shareholders Litig.,* Civ. A. No. 11740, 1993 WL 43024, at *3 (Del.Ch. Feb.16, 1993). When one compares Minton de Ruiz's contention with one of the plaintiffs' central arguments from their opening brief in this appeal, the perceived distinction between "inadequacy of representation" and "collusion" quickly begins to fade:

> *Delaware counsel—paid only on a contingency basis—had no incentive other than to "compromise" other litigants' substantial federal claims.* Counsel knew that, if they settled the federal claim they would get paid; if they attempted to litigate, they would get nothing. Such a one-sided in-

centive structure is surely a constitutionally disabling conflict of interest....

Appellants' Opening Brief at 27 (emphasis in original). And once one recognizes that even this court's *own* inadequacy holding invokes the very same attorney-client antagonism, the majority's effort to obscure substantive identity in semantic minutiae is laid bare:

> Matsushita ... knew that class counsel had an extraordinary incentive to settle and settle *quickly* because that was the *only* way they could extract a fee out of the federal claims.
>
> ....
>
> ... Indeed, the misalignment of interests and incentives between class counsel and their clients in these circumstances was so great that it is fair to say that counsel's interests were more in line with the interests of Matsushita than those of their clients.

Maj. Op. at 1250 (emphasis in original). In sum, try as it may to "label away" objector Minton de Ruiz's argument, the fact remains that a rose by any other name is still a rose: in this case, as the court's opinion amply demonstrates, the primary reason that the class representatives were alleged to have been *inadequate* was the self-interested and, dare I say, *collusive,* conduct of the Delaware class attorneys.

### B

In addition to holding that the inadequacy issue was not "actually litigated" in the Delaware system, this court cites *Prezant v. De Angelis,* 636 A.2d 915 (Del.1994), and suggests that the Delaware courts did not "finally determine" the question of inadequacy in a manner consistent with Delaware law. Maj. Op. at 1241 n. 6. Again, I must agree with the United States Supreme Court's assessment that the available evidence counsels otherwise. In *Prezant,* the Delaware Supreme Court announced the following holding: "[I]n every class action settlement, the Court of Chancery is required to make an explicit determination on the record of the propriety of the class action according to the requisites of Rule 23(a) and (b)," including the mandate that class representation was

---

**3.** The majority would have us read Minton de Ruiz's objection as if it belonged in a Venn

diagram: "All collusion is inadequacy; some inadequacy is collusion...."

adequate. *Prezant,* 636 A.2d at 925. Contrary to the majority's suggestion, the Vice Chancellor in this case specifically made the "explicit determination" contemplated by *Prezant,* when he declared that "it is ... hereby determined that the plaintiffs in the Actions, as representatives of the Settlement Class, have fairly and adequately protected the interests of the Class...." Order and Final Judgment at 2, *In re MCA, Inc. Shareholders Litig.,* Civ. A. No. 11740, 1993 WL 43024 (Del.Ch. Feb. 16, 1993). His "determination," I submit, could not have been more "explicit." What is more, the Delaware Supreme Court—the *very court* that issued the *Prezant* guidelines—entertained additional argument on the inadequacy matter, and expressly and unanimously affirmed the Chancery Court's determination that the class had been adequately represented. *See In re MCA, Inc. Shareholders Litig.,* No. 126,1993, 1993 WL 385041, at *1 (Del. Sept. 21, 1993).[4]

In sum, I conclude, as did the United States Supreme Court, that the question of adequate representation (1) was actually litigated before the Delaware Chancery Court and (2) was decided by that court in a valid and final judgment. Although the plaintiffs in this action were not themselves present before the Vice Chancellor, their grievances were ably litigated through their surrogates, objectors Krupman and Minton de Ruiz. Moreover, as the settlement notice made explicit, the plaintiffs themselves were presented with a "full and fair opportunity" to participate personally in the settlement hearing if they so desired. Consequently, under long-established principles of Delaware preclusion law, I believe that the Delaware courts would give collateral estoppel effect to the Chancery Court's judgment and would forbid plaintiffs from relitigating the merits of the inadequacy issue. *See Messick v. Star Enter.,* 655 A.2d 1209, 1211 (Del.1995); *Evans v. Frank E. Basil, Inc.,* 1986 WL 3973, at *2 (Del.Super.Ct. Mar. 20, 1986). Pursuant to the plain—and now universally acknowledged—meaning of the Full Faith and Credit Act, 28 U.S.C. § 1738, we must do the same. *See Matsushita,* —— U.S. at ——, 116 S.Ct. at 877 ("The Act ... directs all courts to treat a state court judgment with the same respect it would receive in the courts of the rendering state."); *accord Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985); *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 481—82, 102 S.Ct. 1883, 1897–98, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980).

## II

As to the majority's last-gasp invocation of *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), to deny the Delaware judgment issue preclusive effect, I most emphatically protest. The court cites *Shutts* in support of its per se rule that class settlement objectors—such as Krupman and Minton de Ruiz—may never, consistent with the Due Process Clause, finally litigate absent class plaintiffs' rights to adequate representation. *Shutts* simply cannot, in my view, bear the weight of such an extreme interpretation.[5] The concerns that

---

**4.** The majority accuses the Delaware Chancery Court of failing properly to support its conclusion of adequacy, citing language from the *Prezant* opinion suggesting that a court should "articulate on the record its findings regarding the satisfaction of the Rule 23 criteria and supporting reasoning in order to facilitate appellate review." *Prezant,* 636 A.2d at 925. Even if I believed that the quoted language represented the holding of the Delaware Supreme Court—which I do not, *see Goodrich v. E.F. Hutton Group, Inc.,* 681 A.2d 1039, 1045 (Del.1996) (reaffirming that the "essential" requirement recognized in *Prezant* is "a judicial determination that the adequate representation requirement of Rule 23(a)(4) has been satisfied")—I believe that the Chancery Court discharged its responsibility of articulating the reasons for its holding; it

found that although the objectors had alleged that the settlement was collusive, "[s]uspicion ... is not enough." *In re MCA, Inc. Shareholders Litig.,* Civ. A. No. 11740, 1993 WL 43024, at *5 (Del.Ch. Feb. 16, 1993); *see also Youngman v. Tahmoush,* 457 A.2d 376, 381 (Del.Ch.1983) (suggesting that, under Delaware law, the party challenging the adequacy of the class members' representation bears the burden of demonstrating inadequacy). That finding was specifically affirmed by the Delaware Supreme Court.

**5.** It is certainly worthy of note, in this respect, that the majority itself recognizes that the Third Circuit's recent, post-*Shutts,* decision in *Grimes v. Vitalink Communications Corp.,* 17 F.3d 1553 (3d Cir.1994), patently rejects such view. Maj. Op. at 1242.

impelled the *Shutts* Court's recognition of the prerogative of absent plaintiffs generally to "sit back and allow the litigation to run its course," *Shutts,* 472 U.S. at 810, 105 S.Ct. at 2974, plainly are not in play in this case.

The *Shutts* Court was motivated by a concern for fairness to parties who, without the right to "sit back," might be forced to forfeit their claims altogether. The *Shutts* Court found that in light of financial constraints, some plaintiffs, if forced to litigate their own claims, might "have no realistic day in court." *Id.* at 809, 105 S.Ct. at 2973. However, as the following colloquy, which occurred during oral argument before the Supreme Court, makes clear, the Epstein plaintiffs (quite unlike the "absent" class plaintiffs in *Shutts* ) absented themselves from the Delaware fairness hearing not for *financial* reasons, but for *tactical* reasons:

> [COURT]: What about the argument that you should have come into Delaware to make [the inadequacy of representation] objection and not stayed out of it?
>
> [COUNSEL]: ... If we stayed out ... we knew that we could make collaterally the attack on lack of adequate representation [and] due process....

Transcript of Oral Argument at 47, *Matsushita Elec. Indus. Co. v. Epstein,* —— U.S. ——, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). What is more, the Epstein plaintiffs lost absolutely nothing by not attending the settlement hearing. As they sat idly by, content in the notion that they had preserved their right collaterally to attack the Delaware judgment, their substantive arguments were, as detailed above, simultaneously being presented by objectors Krupman and Minton de Ruiz. (Indeed, this fact very likely was known to the Epstein lawyers, in light of objector Krupman's lawyer's admission that his client's objection had originally been drafted by the attorneys representing the Epstein plaintiffs.)

The Epstein plaintiffs have managed, quite literally, to have their cake and eat it too. They now get two bites at the proverbial apple. Today, this court not only *condones* such gluttony, it *constitutionalizes* it. We are constantly reminded that "no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause." *Kremer v. Chemical*

*Constr. Corp.,* 456 U.S. 461, 483, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). For the court to have co-opted the salutary principle announced in *Shutts* and applied it in rote fashion to the facts of this case undermines, in my view, the very concept of due process of law.

### III

The majority seeks to hush Matsushita's "alarmist cry" that the opinion announced today "will sound the death knell to finality in class actions if individual objectors cannot bind absentees on the issue of adequate representation." Maj. Op. at 1242. The court rejects Matsushita's argument as "hyperbole." Maj. Op. at 1242. To allay Matsushita's fears, the court directs its attention to the following passage in the Delaware Supreme Court's opinion in *Prezant:*

> [The approach we announce today] will serve to benefit both class members and defendants. Class members ... will ... have their interests protected by the requirement that their claims cannot be compromised without ... a judicial determination that the Rule 23 criteria have been satisfied.... Such a determination will include a finding that their due process right to adequate representation has in fact been satisfied. Defendants will be protected from a possible collateral attack on the validity of the settlement by a class member claiming the settlement did not meet the requirements of Rule 23. This protection will help insure that the final release sought by defendants in settlements is indeed final.

*Prezant,* 636 A.2d at 925—26. I sincerely doubt that the court's reassurance is of any consolation whatsoever to Matsushita or to other potential class action defendants. If anything, it is a source of consternation. Matsushita, after all, did precisely what the *Prezant* court (and now this court) instructed it to do: It asked for and got a judicial finding—an "express ruling," in the words of the United States Supreme Court—that the

representation of the plaintiff class had been constitutionally adequate. Curiously, today this court tells both Matsushita and the Delaware judiciary that; alas, they did not do enough.

Because I believe that today's decision not only threatens finality, but also contravenes "the elementary principles of federalism and comity," *Growe v. Emison,* 507 U.S. 25, 35, 113 S.Ct. 1075, 1082, 122 L.Ed.2d 388 (1993), that animate the Full Faith and Credit Act, I respectfully dissent.